[No. B083983. Second Dist., Div. Three. Oct. 29, 1996.]

LEBAS FASHION IMPORTS OF USA, INC., Plaintiff and Appellant, v. ITT HARTFORD INSURANCE GROUP, Defendant and Respondent.

## COUNSEL

Khastoo & Saboorian and S. Shawn Khastoo for Plaintiff and Appellant.

Irell & Manella, Thomas W. Johnson, Jr., Don A. Martens, Gauntlett & Associates, David A. Gauntlett, M. Danton Richardson, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Joseph N. Welch II, Adducci, Mastriani & Schaumburg, David A. Guth, Anderson, Kill & Olick, Jordan Stanzler, Eugene R. Anderson, William G. Passannante, Brown & Bain, Jack E. Brown, Robert E. White and Susan C. Rushakoff as Amici Curiae on behalf of Plaintiff and Appellant.

Hawkins, Schnabel, Lindahl & Beck, Kelley K. Beck, Wendy A. Scholl, Dickson, Carlson & Campillo, Hall R. Marston, Aaron M. Peck, Rivkin, Radler & Kremer, William M. Savino, Stephen J. Smirti and Celeste M. Butera for Defendant and Respondent.

Sonnenschein, Nath & Rosenthal, Paul E. B. Glad, Buchalter, Nemer, Fields & Younger and Richard de Saint Phalle as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**CROSKEY, J.**—Lebas Fashion Imports of USA, Inc. (Lebas), appeals from a summary judgment granted in favor of ITT Hartford Insurance Group (Hartford) on Lebas's first amended complaint for breach of an insurance contract and breach of the implied covenant of good faith. After Lebas had been sued in federal court for trademark infringement, Hartford, which had

issued a commercial general liability (CGL) policy to Lebas, denied coverage and refused to provide Lebas with a defense on the ground that the policy did not provide coverage for a claim based on trademark infringement. Lebas thereafter defended and settled the federal suit and then commenced this action.

We agree with Lebas that the "advertising injury" coverage provided under Hartford's CGL policy does extend to a claim for trademark infringement. This is so because the applicable advertising injury offense set out in Hartford's policy is ambiguous and, in the context of the entire policy and all of the relevant circumstances, Lebas had an objectively reasonable expectation of coverage. This requires us to resolve that ambiguity in Lebas's favor. As a result, based on the allegations of the underlying federal action, a potential for coverage existed and Hartford owed Lebas a duty to defend that action. We therefore reverse the judgment and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND[1]

Lebas is an importer and wholesaler of men's clothing in Los Angeles and sells and distributes goods under different brand names. Lebas had obtained a CGL policy from Hartford which was effective during the period October 15, 1991, through October 15, 1992.

On June 15, 1992, Parfums Guy Laroche, a Societe Anonyme (similar to a United States corporation, but organized under the laws of the Republic of France) and Cosmair, Inc., a Delaware Corporation (collectively, Guy Laroche)[2] filed an action in the United States District Court for the Central District of California in which Lebas was named as the defendant. In this action, Guy Laroche alleged that it was engaged in the manufacture, distribution and sale (on a worldwide basis) of high fashion perfumes and cosmetic products under its trade name and trademarks, "DRAKKAR" and "DRAKKAR NOIR."[3] It was also alleged that prior to June 15, 1992, Lebas had adopted and commenced to use the name DRAKKAR on its clothing products, including men's suits, and to advertise those clothing products

---

[1]The relevant facts upon which we rely are essentially undisputed and are disclosed by the papers filed with the trial court in support of and in opposition to Hartford's motion for summary judgment.

[2]Cosmair is the exclusive United States manufacturer and distributor of perfumes and cosmetic products bearing the trademarks issued to and owned by Guy Laroche.

[3]The complaint alleged that Guy Laroche had duly registered and applied to register these trademarks with the United States Patent and Trademark Office, and that the same had been issued in 1973, 1986, 1987, 1988 and 1990.

under the name(s) DRAKKAR and DRAKKAR NOIR. In addition, it was alleged that Lebas had filed an application with the United States Patent and Trademark Office to register the name DRAKKAR as its own (an application to which Guy Laroche had filed opposition).[4]

Lebas tendered defense of this action to Hartford. After concluding that the claims asserted against Lebas were not potentially covered under its CGL policy, Hartford denied coverage and refused a defense. The relevant portion of the CGL policy with which we are concerned is that which provides coverage for "advertising injury."

Under its policy, Hartford promised to "pay those sums that [Lebas] becomes legally obligated to pay as damages because of . . . 'advertising injury' . . ."; and the policy also stated that Hartford would "have the right and duty to defend any 'suit' seeking those damages." In addition, the policy provided that the "advertising injury" to which it applied was limited to "an offense committed in the course of advertising [Lebas's] goods, products or services." The term "advertising injury" was defined to mean an "injury arising out of one or more of the following offenses: a. . . . [¶] b. . . .[5] [¶] c. *Misappropriation of advertising ideas or style of doing business*; or [¶] d. *Infringement of copyright, title or slogan*." (Italics added.) There is no claim by Hartford that any exclusion contained in the policy has any application to the coverage issue. Thus, the insuring clause provisions quoted above are the only portions of the policy with which we are concerned.

After Hartford refused to provide a defense, Lebas undertook to and did settle the underlying action with Guy Laroche. Lebas entered into a stipulated consent judgment which required the payment of monetary damages and an injunction restraining any future use of the name DRAKKAR. Lebas then filed this action against Hartford for its breach of contract and bad faith refusal to defend Lebas in the underlying action. Hartford moved for summary judgment, claiming that there never was any potential for coverage under the policy and therefore no duty to defend had ever arisen. Lebas

[4]Guy Laroche's complaint alleged six causes of action against Lebas (federal trademark infringement, federal unfair competition, California common law unfair competition, California common law trademark infringement, California statutory unfair competition and California statutory trademark dilution); however, they were all based on the same essential facts which supported the initial claim of federal trademark infringement.

[5]Subparagraphs a and b describe the two other "offenses" which constitute advertising injury under the policy, but they are not claimed by Lebas to be involved in this case. Those are: "a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; b. Oral or written publication of material that violates a person's right of privacy; . . ."

opposed the motion, arguing that coverage was available under the "advertising injury" provisions of the policy.

On February 17, 1994, the trial court granted Hartford's motion after it concluded that the relevant policy provisions were clear and unambiguous and that no coverage was provided for a trademark infringement. Judgment was entered on March 3, 1994, and this timely appeal by Lebas followed.

## ISSUE PRESENTED

The sole question before us is whether an alleged trademark infringement is potentially covered by policy language promising coverage for (1) the misappropriation of advertising ideas or style of doing business or (2) the infringement of copyright, title or slogan. This is an issue which has not heretofore been directly addressed by any California court and involves the construction and application of relatively new standard policy language contained in many post-1986 CGL policies.

## DISCUSSION

### 1. Standard of Review.

■ Summary judgment is properly granted when the evidence in support of the moving party establishes there is no issue of fact to be tried. (Code Civ. Proc., § 437c; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) If the trial court determines there is no triable issue of fact, it determines the legal issues in the case. (*Taylor* v. *Fields* (1986) 178 Cal.App.3d 653, 659 [224 Cal.Rptr. 186].) Appellate review of a summary judgment motion consists of a de novo review of the pleadings presented to the trial court in support of, and in opposition to, the motion. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)

As there is no dispute as to the relevant facts which we have summarized above, we exercise our independent judgment as to their legal effect. The sole issue with which we are concerned, involves the meaning, construction and application of the language of the policy. That is a pure issue of law. (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 35 [221 Cal.Rptr. 171].)

### 2. The Duty to Defend Depends on a Potential for Coverage.

■ It is settled that an insurer must defend any action which *potentially* seeks damages within the coverage of the policy. (*Gray* v. *Zurich Insurance*

*Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) This obligation can be excused only when the third party complaint " '*can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153], quoting from *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15, italics added by *Montrose* court.) "In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" (6 Cal.4th at p. 300, italics in original.) Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. (*CNA Casualty of California* v. *Seaboard Surety Co.* (1986) 176 Cal.App.3d 598, 607 [222 Cal.Rptr. 276], disapproved on another point in *Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at pp. 296-298.)

However, while the duty to defend is broad, it is not unlimited. It is entirely dependent upon a showing by the insured that the third party claim for which it seeks a defense is one for damages which *potentially* fall within the policy coverage. It is the nature and kind of risk covered by the policy which both defines and limits the duty to defend. (*Dyer* v. *Northbrook Property & Casualty Ins. Co.* (1989) 210 Cal.App.3d 1540, 1547 [259 Cal.Rptr. 298].) Of course, once a potential for coverage is established as to at least one of the claims asserted against the insured, ". . . the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim. [Citations.]" (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].)

Finally, it is settled that a potential for coverage cannot be based on an unresolved legal dispute concerning policy interpretation which is ultimately resolved in favor of the insurer. (*A-Mark Financial Corp.* v. *CIGNA Property & Casualty Cos.* (1995) 34 Cal.App.4th 1179, 1192 [40 Cal.Rptr.2d 808].) In this case, we are presented with an unresolved legal issue as to the proper interpretation and application to be given to the applicable advertising injury offenses set out in Hartford's policy. Hartford can only have a duty to defend if we construe those policy provisions in favor of Lebas.

3. *General Principles of Trademark Infringement.*

A trademark is defined under the relevant federal statute (15 U.S.C. § 1127) as "any word, name, symbol or device or any combination thereof [¶] (1) used by a person, or [¶] (2) which a person has a bona fide intention

to use in commerce and applies to register on the principal register . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."

An infringement of a trademark is defined as an act committed by any person who, without the consent of the registrant shall: "(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or [¶] (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." (15 U.S.C. § 1114.)

"A trademark serves three distinct and separate purposes: (1) It identifies a product's origin, (2) it guarantees the product's unchanged quality, and (3) *it advertises the product.* Injury to the trademark in any of its offices as an identifying, guaranteeing or advertising device should suffice to constitute an infringement thereof." (3A Callmann, The Law of Unfair Competition, Trademarks and Monopolies (4th ed. 1994) § 21.06, p. 41, italics added, fn. omitted.) As one court has stated, "A trademark is but a species of advertising, its purpose being to fix the identity of the article and the name of the producer in the minds of people who see the advertisement, so that they may afterwards use the knowledge themselves and carry it to others having like desires and needs for such article." (*Northam Warren Corp.* v. *Universal Cosmetic Co.* (7th Cir. 1927) 18 F.2d 774, 774.) Moreover, as the trademark statute itself makes clear, the *advertising* of a good or service is one of the ways in which an act of infringement can occur.

Contrary to cases involving patent infringement, where the infringing activity usually involves the making, using or selling of the patented invention, and thus may not occur in the course of the insured's *advertising activities* (see, e.g., *Iolab Corp.* v. *Seaboard Sur. Co.* (9th Cir. 1994) 15 F.3d 1500, 1506; *National Union Fire Ins. Co.* v. *Siliconix, Inc.* (N.D.Cal. 1989) 729 F.Supp. 77, 79), a trademark infringement by the insured can and often does occur in the course of the insured's act of advertising its products. Thus, we do not have the problem, presented in other circumstances (see

e.g., *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1275 [10 Cal.Rptr.2d 538, 833 P.2d 545]), of determining whether a nexus exists between the insured's advertising activity and the alleged infringement. ▮▮▮ We will, at least for the purposes of this opinion, accept as true the proposition that Lebas's alleged trademark infringement occurred in the course of its advertising activities and that the required nexus existed.[6] However, that still requires us to resolve the question as to whether Lebas's infringing acts constituted an "advertising injury" as defined in the Hartford policy.

4. *Trademark Infringement Is Covered by Hartford's "Advertising Injury" Policy Provisions.*

Prior to 1986, coverage for advertising injury was defined differently than it is under Hartford's policy. The 1973 standard Insurance Services Office (ISO) form defined "advertising injury" to include: "Injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities, if such injury arises out of libel, slander, defamation, violation of right of privacy, piracy, *unfair competition,* or infringement of copyright, title or slogan." (Italics added.) Coverage for trademark infringement was expressly excluded.

In 1986, this definition was modified significantly. Advertising injury is now defined under the relevant portion of Hartford's policy as an injury arising from either (1) "misappropriation of an advertising idea or style of doing business" or (2) "infringement of copyright, title or slogan." The offenses of unfair competition and piracy have been deleted, as has the exclusion for trademark infringement. While the fact of these changes is consistent with the proposition that a potential for coverage of a claimed trademark infringement might now exist, it is hardly determinative. The terms "misappropriation," "advertising idea" and "style of doing business" are not defined.

Lebas relies on such lack of definition to argue that the terms are ambiguous and that they should therefore be construed in its favor because its expectation of a defense was objectively reasonable. Hartford, on the other hand, contends that the term "misappropriation," as used in the policy, refers only to the common law tort and not to federal statutory trademark protection. It further contends that the misappropriation of an "advertising

---

[6]Moreover, as we have noted, Guy Laroche's complaint expressly alleged that Lebas's infringement of the trademark specifically included the use of the names DRAKKAR and DRAKKAR NOIR in advertisements of Lebas's products.

idea" which is covered by the policy is limited to the circumstance where one party is presented with an idea or plan for an advertising campaign or promotion by another, who has a protectable property interest in that idea, and the first party uses the idea without compensation to its creator. Similarly, Hartford argues that misappropriation of a "style of doing business," as that term is used in its policy, refers solely to a company's *manner* of operating its business or, to put it simply, its "trade dress." (See, e.g., *St. Paul Fire & Marine* v. *Advanced Interventional* (E.D.Va. 1993) 824 F.Supp. 583, 585, affd. (1994) 21 F.3d 424 [applying California substantive law to conclude that a *patent* infringement did not amount to the misappropriation of a "style of doing business"].)

■ It is settled that the absence from the policy of a definition of particular terms does not necessarily establish that such terms are ambiguous (*Bay Cities Paving & Grading Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866 [21 Cal.Rptr.2d 691, 855 P.2d 1263]); however, that circumstance can certainly lead to the kind of dispute which is now before us. It is also clear that we are required, in interpreting a policy, to read the disputed terms as " ' " 'a layman would read [them] and not as [they] might be analyzed by an attorney or an insurance expert.' " [Citation.]' " (*Delgado* v. *Heritage Life Ins. Co.* (1984) 157 Cal.App.3d 262, 271 [203 Cal.Rptr. 672]; see also *Lundsford* v. *American Guaranty & Liability Ins. Co.* (9th Cir. 1994) 18 F.3d 653, 655; *American Star Ins. Co.* v. *Insurance Co. of the West* (1991) 232 Cal.App.3d 1320, 1330-1331 [284 Cal.Rptr. 45]; *Cal-Farm Ins. Co.* v. *TAC Exterminators, Inc.* (1985) 172 Cal.App.3d 564, 578 [218 Cal.Rptr. 407].) As we now explain, applying this principle, as well as settled rules of policy construction, causes us to conclude that these terms are indeed ambiguous.

The Supreme Court recently described the general principles which must guide a court in its resolution of claims of ambiguity in insurance policy language. ■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' (*Id.* § 1649; [citation].) This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, '*the objectively reasonable expectations of the insured.*' [Citation.] Only if this

rule does not resolve the ambiguity do we then resolve it against the insurer. [Citation.] [¶] In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because '*language in a contract* must be construed in the context of that instrument as a whole, and in the circumstances of that case, and *cannot be found to be ambiguous in the abstract.*' [Citation.]" (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at pp. 1264-1265; first italics added by this court, latter italics added by the *Bank of the West* court.)

 What this requires us to do first is to try and determine the parties' mutual intention solely from the words used. As there is no evidence that the parties intended any technical or special meaning for the relevant policy provisions, we must examine the words used in "their ordinary or popular sense." (*AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) If two or more constructions of a word or phrase are reasonable, then an ambiguity exists. (*Bay Cities Paving & Grading Inc.* v. *Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th at p. 867.) While we cannot adopt a strained construction of any term in order to create an ambiguity and we must read the policy language in the context of the instrument as a whole (*ibid.*), we cannot but conclude, after applying these well-settled principles of policy construction, that Lebas is correct in its assertion that the policy terms "misappropriation," "advertising idea" and "style of doing business" do not have a single, plain and clear meaning. Hartford insists that the ordinary and popular usage of the terms "misappropriation," "advertising idea" and "style of doing business" suggests only one meaning, thus precluding a conclusion of ambiguity. We disagree. Although general dictionary definitions of the relevant policy terms would reflect many popular meanings,[7] any one of which might be reasonable in the abstract, we recognize that discovery of an ambiguity is not a matter of "abstract philology." (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.) We must evaluate and apply the ordinary and popular sense of the words in the context of their use in the policy.

---

[7]For example, Webster's Third New International Dictionary (1981) page 1442, defines "misappropriate" to mean, among other things, "to appropriate dishonestly for one's own use" and "to appropriate wrongly or misapply in use." The word "idea" is defined as a "presentation of sense, concept, or representation," as well as: "an object of a concept," "a conception or standard of any perfection," "a visible representation of a conception" and "a product of reflection or mental concentration: a formulated thought or opinion." (*Id.* at p. 1122.) Finally, the word "style" is defined, among other words, as a "mode of expressing thought in oral or written language." Examples include, "a manner of expression characteristic of an individual, a period, a school, or other identifiable group" as well as "the manner, tone, or orientation assumed in discourse." (*Id.* at p. 2271.)

Thus, we look at these words not in isolation but rather as part of the disjunctive phrases which are actually used in the policy: "misappropriation of an advertising idea" and "[misappropriation] of [a] style of doing business." We also examine these phrases through the eyes of a layman rather than an attorney or insurance expert.[8] Using that approach, we inquire whether those phrases have a single "clear and explicit" meaning or are they subject to two or more reasonable constructions which can be placed on them without engaging in a strained interpretation. (*Shell Oil Co.* v. *Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737 [15 Cal.Rptr.2d 815].)

As already noted, Hartford contends that the term *misappropriation* has a single plain and clear meaning which can only refer to the common law tort of misappropriation. Hartford primarily relies on the now vacated and superseded (sub. opn. (N.D.Cal. 1994) 900 F.Supp. 1246) decision in *American Economy Ins. Co.* v. *Reboans, Inc.* (N.D.Cal. 1994) 852 F.Supp. 875 (*Reboans I*),[9] where the court first noted that common law misappropriation has three elements, *none of which involves the confusion of source element required for a trademark infringement claim.* Those three elements are: (1) the plaintiff "has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that 'thing' as a kind of property right," (2) the defendant "has appropriated the 'thing' at little or no cost, such that the court can characterize defendant's actions as 'reaping where it has not sown' " and (3) the defendant "has injured plaintiff by the misappropriation." (*Id.* at p. 879, citing 1 McCarthy, McCarthy on Trademarks and Unfair Competition (3d ed. 1992) § 10.25, pp. 10-97 to 10-99.)

In *Reboans I,* the court went on to state that while a viable trademark infringement claim depends upon a showing of consumer confusion, "Common law misappropriation is different. Its sole purpose is to create quasi-property rights, and Congress has stated that a person has a property right in a word or style—things that would otherwise be subject to a First Amendment challenge—only if the word or style is distinctive and another's use of

---

[8]This policy construction principle is particularly important here. The basic contention raised by Hartford and the amici curiae arguing in support of its position rests upon very sophisticated legal arguments as to the narrow and technical meaning that must be given to the word "misappropriation," which limits its application to the common law tort of the same name. As we explain, we have little doubt that a layman would most probably not arrive at that conclusion at all, but rather would give the word its common and ordinary meaning, that is, "to take wrongfully."

[9]This opinion was effectively overruled by a subsequent order of the same court (although by a different judge) which granted reconsideration of the judgment entered in *Reboans I* and entered a new and different judgment based upon reasoning which is consistent with the views which we express herein. (*American Economy Ins. Co.* v. *Reboans, Inc.* (N.D.Cal. 1994) 900 F.Supp. 1246 (*Reboans II*).)

it would likely cause consumer confusion. 'If there can be such a thing as "misappropriation" of another's trademark, irrespective of distinctiveness and likelihood of buyer confusion, then a big step has been taken to wipe out the law of trademarks.' [Citations.] Recognizing a property right in an advertising idea or style of doing business that would not be protected under the Lanham Act would undermine the 'purposes and objectives of Congress.' [Citations.] Accordingly, it cannot be done." (852 F.Supp. at pp. 880-881.) The court then concluded, "Until 1986, the standard ISO CGL form included 'unfair competition' as a covered class of advertising injuries, and explicitly excluded injuries resulting from trademark, service mark, and trade name infringement. In 1986, ISO revised the standard form: unfair competition was eliminated in favor of misappropriation of advertising ideas and style of doing business, and the trademark, service mark and tradename exclusion was eliminated. As [the insurer points out], the trademark infringement exclusion had been necessary when the policy insured unfair competition claims, because 'unfair competition' includes counterfeiting and trademark infringement. After unfair competition was replaced with misappropriation of advertising ideas and style of doing business, however, the exclusion was redundant, because one could not misappropriate a trademark." (*Reboans I, supra*, 852 F.Supp. at p. 882.) Hartford presses this same argument here.

In our view, however, it is equally reasonable, for example, to ascribe to the term misappropriation the more general meaning of "to take wrongfully" as it is to limit it to its technical common law sense. (See, e.g., *Dogloo, Inc.* v. *Northern Ins. Co. of New York* (C.D.Cal. 1995) 907 F.Supp. 1383, 1388-1389.) Similarly, while the misappropriation of an "advertising idea" certainly would include the theft of an advertising plan from its creator without payment, it is also reasonable to apply it to wrongful taking of the *manner or means* by which another advertises its goods or services. As we have already explained, one of the basic functions of a trademark is to *advertise* the product or services of the registrant.[10] For the same reason, a trademark could reasonably be considered an integral part of an entity's "style of doing

---

[10]We do not necessarily agree with Hartford's argument that trademark law cannot be applied to protect a particular "advertising idea" or "style of doing business." Many trademarks embody advertising ideas, such as the milk industry's "GOT MILK?" campaign, the pink Energizer bunny that "KEEPS ON GOING," or Nike's "JUST DO IT!" campaign and swoosh symbol. These and many other advertising ideas are subject to protection under the trademark and unfair competition laws. (See, e.g., *Eveready Battery Co. Inc.* v. *Adolph Coors Co.* (N.D.Ill. 1991) 765 F.Supp. 440, 448-450 [ENERGIZER® bunny advertising theme protectable under trademark law]; *Nike, Inc.* v. *Just Did It Enterprises* (7th Cir. 1993) 6 F.3d 1225, 1227 ["Just Do It!" advertising theme protectable under trademark law].) More to the point, even if such protection were not available, that would not foreclose the flipside conclusion that an insured could have an objectively reasonable expectation that a protectable

business." One need look no further than today's current crop of expensive television commercials advertising high-fashion jeans, heavily endorsed athletic shoes or distinctively styled fast-food restaurants to know the truth of that statement.[11]

Given these multiple reasonable meanings and connotations which may be given to the new policy language defining one of the advertising injury offenses, we conclude that an ambiguity exists. ▪▪▪ Applying the analytical approach outlined in *Bank of the West*, we must next attempt to resolve that ambiguity by interpreting the language used in the sense in which Hartford believed that Lebas must have understood it at the time of policy issuance; or, to put it another way, we must look to the *objectively reasonable expectations* of Lebas. We do this by examining the language in the context of its apparently intended function in the policy and with due consideration to the circumstances in this case. (*Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.)

---

trademark could be included within the *broader* terms, "advertising idea" or "style of doing business"

[11]A wide variety of business styles have been protected under trademark law. In *Two Pesos Inc.* v. *Taco Cabana Inc.* (1992) 505 U.S. 763 [120 L.Ed.2d 615, 112 S.Ct. 2753], the Supreme Court upheld a jury verdict finding the style of presentation of plaintiff's Mexican restaurant (including "a festive eating atmosphere having interior dining and patio areas with artifacts, bright colors, paintings and murals") protectable and infringed. (505 U.S. at pp. 767-768 [120 L.Ed.2d at p. 623].) In *Qualitex* v. *Jacobson Products* (1995) 514 U.S. 159 [131 L.Ed.2d 248, 115 S.Ct. 1300], the Supreme Court held that the green-gold color of plaintiff's dry cleaning press pads was protectable and registrable as a trademark. (*Id.* at p. __ [131 L.Ed.2d at p. 260].) Justice Breyer stated, "[i]t is the source-distinguishing ability of a mark—not its ontological status as color, shape, fragrance, word or sign—that permits it to serve [the] basic purposes [underlying trademark law]." (*Id.* at p. __ [131 L.Ed.2d at p. 254].) The styles of doing business that are protected under trademark and unfair competition law assume many forms, including: building and restaurant styles (*Two Pesos, Inc., supra,* 505 U.S. at pp. 767-768 [120 L.Ed.2d at p. 623]; *Fotomat Corp.* v. *Photo Drive-Thru, Inc.* (D.N.J. 1977) 425 F.Supp. 693, 709-710 [holding, however, that plaintiff's kiosk design was *not* misappropriated]); performing styles (*Smith* v. *Montoro* (9th Cir. 1981) 648 F.2d 602, 606-607 [substituting false name for plaintiff actor's in movie credits]); product styles (*Cutler-Hammer, Inc.* v. *Universal Relay Corp.* (S.D.N.Y. 1968) 285 F.Supp. 636, 637 [enjoining defendant from mislabeling plaintiff's old products as plaintiff's new products]); and sales techniques (*Original Appalachian Artworks, Inc.* v. *Toy Loft, Inc.* (11th Cir. 1982) 684 F.2d 821, 831 [protecting "adoption procedures" used as a selling technique by doll manufacturer]). Similarly, trade names are normally considered to be "styles of doing business" and are protected under the same principles as trademark law. (See, e.g., *American Steel Foundries* v. *Robertson* (1926) 269 U.S. 372, 380 [70 L.Ed. 317, 321, 46 S.Ct. 160] ["[trademark] is applicable to the vendible commodity [while trade name is applicable to] a business and its goodwill. . . . But the precise difference is not often material, since the law affords protection against . . . appropriation [of either] . . . upon the same fundamental principles"]; see also *Accuride Int., Inc.* v. *Accuride Corp.* (9th Cir. 1989) 871 F.2d 1531, 1534-1535 [trademark and trade name protections are governed by the same test of infringement and serve the same basic purpose].)

The policy expressly provides coverage for advertising injury claims. While it is true that the language we consider was adopted contemporaneously with the deletion of the offense of "unfair competition," it does not follow that trademark infringement was likewise eliminated as a covered act. Trademark infringement is an act of unfair competition (*Curtis-Universal* v. *Sheboygan E.M.S., Inc.* (7th Cir. 1994) 43 F.3d 1119, 1124 ["The traditional trademark infringer gets sales unfairly from a competitor by leading consumers to think that the infringer's product or service is of higher quality than it is."]); it amounts to the wrongful taking of another's identifying mark. In other words, trademark infringement involves a very specific kind of unfair competition.[12]

Hartford's contention that the phrase "misappropriation of an advertising idea or style of doing business" is necessarily limited to a common law tort, which excludes a claim for trademark infringement, depends upon an unreasonably narrow construction of the single word, "misappropriation." But even if examined in isolation, as the court stated in *Reboans I, supra*, 852 F.Supp. 875, the three elements of the common law tort of misappropriation require that: (1) a plaintiff must have "invested substantial time and money" in developing a property, (2) the defendant must have appropriated the property at little or no cost and (3) the plaintiff was injured by the defendant's conduct. (*Id.* at p. 879; see also *Balboa Ins. Co.* v. *Trans Global Equities* (1990) 218 Cal.App.3d 1327, 1342 [267 Cal.Rptr. 787], cert. denied, *sub nom., Collateral Protection Ins. Service* v. *Balboa Ins. Co.* (1990) 498 U.S. 940 [112 L.Ed.2d 311, 111 S.Ct. 347].) A trademark infringement would arguably include all of these elements, but also would require a showing which satisfied the additional statutory elements of a trademark claim including evidence that the unauthorized use was "likely to cause confusion, or to cause mistake, or to deceive." (15 U.S.C. § 1114.) This additional element, necessary to the assertion of the statutory claim, does not preclude the conclusion that a wrongful taking has occurred. If, as we have already concluded, a trademark could reasonably be considered to be part of an advertising idea or a style of doing business, then certainly the objectively

---

[12]As one court put it, "A claim of trademark infringement is but a part of the broader claim of unfair competition. [Citation.] Thus, while [a mark] may be generic and not entitled to trademark protection, [a] claim of unfair competition is not foreclosed. [¶] '[U]nfair competition . . . encompass[es] a broader range of unfair practices which may be generally described as a misappropriation of the skill, expenditures, and labor of another.' *American Footwear Corp.* v. *General Footwear Co.* 609 F.2d 655, 662 (2d Cir. 1979), cert. denied, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980). Such practices include 'confusing the public into mistakenly purchasing the product in the belief that the product is [that of] the competitor.' " (*The Murphy Door Bed Co., Inc.* v. *Interior Sleep Systems, Inc.* (2d Cir. 1989) 874 F.2d 95, 102, quoting from *American Footwear Corp.* v. *General Footwear Co.* (2d Cir. 1979) 609 F.2d 655, 662.)

reasonable expectations of Lebas could have included the possibility that a trademark infringement was covered. In other words, contrary to Hartford's argument, "misappropriation of an advertising idea or style of doing business" and trademark infringement are not mutually exclusive.

Hartford's analogy to the analysis contained in *Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at pages 1264-1269, is not persuasive. Hartford points out that the *Bank of the West* court held that while the term "unfair competition," as used in the pre-1986 definition of advertising injury, might be ambiguous in the abstract in that it could include both common law and statutory unfair competition, such a construction was not possible when the term was considered in the context of the entire policy. That policy provided coverage for *damages* arising from an advertising injury. However, statutory unfair competition (Bus. & Prof. Code, § 17200) does not authorize recovery of damages (but only the limited remedies of injunction and restitution). Moreover, public policy considerations would preclude providing insurance to indemnify an insured for a judgment requiring the disgorgement of money or property which had been obtained wrongfully. Thus, coverage, which depended upon the existence of a claim for "damages," could not exist for a claim against the insured which was based upon statutory unfair competition. The term "unfair competition" *necessarily* had to be limited to the common law tort of unfair competition. We have no such clarity here. There is nothing about the terms "misappropriation of an advertising idea" or "misappropriation of a style of doing business," neither of which constitutes a recognized tort, which compels us to conclude one way or the other as to just how broadly or narrowly they should be read. Nor is there anything about the statutory offense of trademark infringement which necessarily precludes its inclusion as a part of either.

It appears to us, reading the policy as a layman would, that an objectively reasonable purpose of the phrase "misappropriation" of either an "advertising idea" or a "style of doing business" is an attempt to restrict or more narrowly focus the broader coverage potentially encompassed by the general term, "unfair competition" which was utilized in the earlier policy language. When read in light of the fact that a trademark infringement could reasonably be considered as one example of *a* misappropriation, and taking into account that a trademark could reasonably be considered to be part of either an advertising idea or a style of doing business, it would appear objectively reasonable that "advertising injury" coverage could now extend to the infringement of a trademark.

In addition, it is not obvious that elimination of the trademark infringement exclusion was because it was no longer needed in light of the deletion

of unfair competition as a covered offense. ▮▮▮ ▮▮▮ In the mind's eye of an objectively reasonable insured, that elimination could well represent a conscious recognition of trademark infringement as an offense subject to advertising injury coverage.[13] ▮▮▮ Indeed, the fact that the trademark exclusion was dropped from the policy could contribute to the objectively reasonable expectation that a trademark infringement was now a covered act under the advertising injury clause. Such a result is entirely consistent with a significant number of federal cases which have decided, albeit without much analysis, that a trademark is both an "advertising idea" and a "style of doing business" and its misappropriation is an advertising injury offense. (*Dogloo Inc.* v. *Northern Ins. Co. of New York, supra,* 907 F.Supp. at pp. 1389-1390; *Union Ins. Co.* v. *The Knife Co., Inc., supra,* 897 F.Supp. at p. 1216; *Poof Toy Products, Inc.* v. *U.S. Fid. & Guar. Co.* (E.D.Mich. 1995) 891 F.Supp. 1228, 1234; *Advance Watch Co., Ltd.* v. *Kemper Nat. Ins. Co.* (E.D.Mich. 1995) 878 F.Supp. 1034, 1039;[26] *P.J. Noyes Co.* v. *American Motorists Ins. Co.* (D.N.H. 1994) 855 F.Supp. 492, 494-495; *J.A. Brundage*

[13]We recognize that drafting history documents may provide some evidence of a contrary intent on the part of those responsible for drafting the 1986 ISO policy changes. However, whatever use may properly be made of drafting history (see e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 673 [42 Cal.Rptr.2d 324, 897 P.2d 1]), it may not be considered to defeat an insured's objectively reasonable expectations of coverage arising from the policy language utilized by the insurance industry draftsmen. (See, e.g., *American Star Ins. Co.* v. *Insurance Co. of the West, supra,* 232 Cal.App.3d at pp. 1330-1332, fns. 8 and 9; see also *Prudential-LMI Commercial Ins. Co.* v. *Reliance Ins. Co.* (1994) 22 Cal.App.4th 1508, 1513 [27 Cal.Rptr.2d 841].) Those draftsmen had it within their power to make clear the full scope of the coverage offered as well as any limitations they wished to place thereon. Their failure to do so cannot justify our rejection of an insured's objectively reasonable expectations as to coverage which arise from the words chosen by the drafters. (*Union Ins. Co.* v. *The Knife Co., Inc.* (W.D.Ark. 1995) 897 F.Supp. 1213, 1216.)

[14]In *Advance Watch,* the district court held that the phrase "misappropriation of an advertising idea or style of doing business" was not ambiguous and was broad enough to encompass a claim of trademark or trade dress infringement. This decision was reversed by the court of appeals on November 5, 1996, subsequent to oral argument in this matter. (*Advance Watch Co., Ltd.* v. *Kemper Nat. Ins. Co.* (6th Cir. 1996) 99 F.3d 795 [40 U.S.P.Q.2d 1545].) In that decision, the court agreed that the phrase was unambiguous, but held that it "does not necessarily refer only to the common-law tort of misappropriation . . . but, we conclude, it does refer to the unauthorized taking or use of interests *other* than those which are eligible for protection under statutory or common-law trademark law. . . . [¶] . . . . Recognition of trademark and trade dress infringement as a distinct category of actionable conduct is so common that the only reasonable assumption is that if [the insurer] had intended to provide coverage for such liability, the insurer would have referred to it by name in the policy, as it did in the case of 'infringement of copyright, title or slogan.' [Citation.]" (*Advance Watch, supra,* at pp. 802-803, italics added.)

In reaching this conclusion, the court of appeals in *Advance Watch* did not apply, as we are required to do under California law, the principle that disputed policy language must be examined through the eyes of a layman rather than an attorney or insurance expert. (See fn. 8, *ante.*) In fact, the court acknowledged that, "[a] layperson might at first glance read the term so broadly as to include in its scope trademark and trade dress infringement" and suggested

*Plumbing* v. *Massachusetts Bay Ins.* (W.D.N.Y. 1993) 818 F.Supp. 553, 557, vacated after settlement, 153 F.R.D. 36, 38 (W.D.N.Y. 1994).)

We therefore conclude that the allegations of Guy Laroche's complaint charging Lebas with trademark infringement were sufficient to charge the commission of an act potentially covered under the policy. This was enough to establish Hartford's duty to provide Lebas with a defense to the underlying federal action.[15] It was thus error for the trial court to enter summary judgment in Hartford's favor.

### DISPOSITION

The judgment is reversed. The matter is remanded for further proceedings consistent with the views expressed herein. Lebas shall recover its costs on appeal.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied November 27, 1996, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 22, 1997.

---

that such an approach could well lead to the "absurd result" of providing coverage for trademark infringement without mentioning the word "trademark." (*Advance Watch Co.,* *supra,* 99 F.3d at p. 803.) Later, the court noted that "it is common practice, *but not legally precise,* to refer to 'misappropriation' of a trademark or trade dress." (*Id.* at pp. 805-806, italics added.) It is clear that the *Advance Watch* court applied the same narrow technical approach to policy interpretation which was urged upon us in this matter by Hartford. For the reasons discussed above in our opinion, we do not believe that in this case such an approach is appropriate under California law.

[15]In view of this conclusion we need not reach or discuss Lebas's argument that a trademark infringement also constitutes an infringement of "title" or "slogan." This argument is based upon Lebas's particular interpretation of the policy's fourth defined advertising injury offense: "infringement of copyright, title or slogan." There is no California case on the point. It is the contention of Hartford and amici curiae that this offense must be narrowly read to provide coverage only for matters protected by the copyright laws or for literary, musical or artistic titles and slogans which are protected under principles of unfair competition. While this is an interesting and important unresolved issue, we decide this case by our interpretation and application of the third advertising injury offense, "misappropriation of an advertising idea or style of doing business"; therefore, there is no need for us to reach this question.