**WINKLEVOSS CONSULTANTS, INC.**
**and Howard Winklevoss,**
**Plaintiffs,**

v.

**FEDERAL INSURANCE CO., Defendant.**

**No. 97 C 1621.**

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 23, 1998.

John Stanley Vishneski, Neal, Gerber & Eisenberg, Chicago, IL, Paul R. Walker–Bright, Keck, Mahin & Cate, Chicago, IL, David A. Stall, Gavntlett & Associates, Irvine, CA, Jeffrey D. Diamond, David A. Gauntlett, Gauntlett & Associates, Irvine, CA, for Winklevoss Consultants, Inc., and Howard Winklevoss.

Robert Marc Chemers, Michael Anthony Clarke, Daniel Gene Wills, Pretzel & Stouffer, Chtd., Chicago, IL, for Federal Ins. Co.

## *MEMORANDUM OPINION AND ORDER*

CASTILLO, District Judge.

An insurance company's duty to defend intellectual property claims under the rubric of "advertising injury" is the subject of countless lawsuits—indeed, a recent litigation explosion—throughout the country. This Court is no exception to the phenomenon, having before it three cases that raise this very issue. In this case, the Winklevoss plaintiffs ("Winklevoss") seek a declaratory judgment that defendant Federal Insurance Company has a duty to defend it against a suit alleging Illinois Trade Secrets Act violations, tortious interference with contractual and business relationships, conversion of propriety subject matter, and unfair competition. The plaintiff in the underlying suit claims Winklevoss misappropriated its trade secrets to develop a competing software product—a product Winklevoss later helped promote to some of the plaintiff's customers. These allegations, Winklevoss asserts, claim "advertising injury," an accusation that Winklevoss claims Federal has agreed to defend. Federal, however, vigorously disputes that these allegations trigger a duty to defend under its "advertising injury" provisions. Before the Court are the parties' cross-motions for summary judgment on this issue.

### RELEVANT FACTS[1]

**I. The Lynchval Suit**

In March 1995, Lynchval Systems, Inc. filed an eight-count complaint in the Northern District of Illinois against Winklevoss and an actuarial consulting firm, Chicago Consulting Actuaries, Inc. ("CCA"). *See Lynchval Systems, Inc. v. Chicago Consulting Actuaries et al.,* Complt. at 1 ("Lynchval Complt."). The original complaint[2] directed six counts at Winklevoss: Count II, tortious interference with Lynchval and CCA's contractual relationship; Count IV, wrongful interference with Lynchval and one of its customer's contractual relationships; Count V, tortious interference with Lynchval's prospective business relationships; Count VI, violation of the Illinois Trade Secrets Act; Count VII, conversion of propriety subject matter; and Count VIII, unfair competition. CCA was named along with Winklevoss in all counts except the second, and was accused

---

1. The facts are derived in part from the parties' statements of uncontested facts and responses to those facts, which the parties submitted with their summary judgment materials. *See* Northern District of Illinois Local General Rule 12(M)–(N). The remaining facts come from the complaint in the underlying lawsuit and from the insurance policies that Federal issued to Winklevoss. *See Hurst–Rosche Eng'rs. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995) (" 'In determining whether an insurer has a duty to defend its insured, the court must look to the allegations in the underlying complaint and compare these allegations to the relevant coverage provisions of the insurance policy.' ") (quoting *Crum & Forster Managers Corp. v. Resolution Trust Corp.,* 156 Ill.2d 384, 393, 189 Ill.Dec. 756, 620 N.E.2d 1073, 1079 (1993)).

2. Lynchval later file a Second Amended Substitute Complaint adding allegations that Winklevoss disparaged Lynchval's products. Federal accepted defense obligations for the second amended complaint with a reservation of rights (but has since requested that it be allowed to withdraw its defense). The duty to defend the second amended complaint, however, is not at issue here, as we explain below.

separately of breach of contract and fiduciary duty.

These causes of action are premised on Lynchval's allegations that Winklevoss and CCA misappropriated trade secrets from Lynchval's actuarial software programs, developed a competing product, and then promoted it to some of Lynchval's customers. Lynchval designed two software programs, "LynchVal" and "LVmed," which actuaries use to determine the cost of their clients' employee benefit plans. Lynchval Complt. ¶¶ 7–9. The programs perform complex calculations on raw data, such as age and gender, and incorporate variables, such as mortality tables and interest rates, to project costs for a particular benefit scheme. *Id.* ¶ 10. Lynchval considers the mathematical formulas for these calculations, as well as the questions prompting the user to input raw data, to be trade secrets. *Id.* ¶¶ 12, 57, 59. Because any software user has ready access to these trade secrets, Lynchval requires each prospective customer to sign a confidentiality agreement promising not to develop competing products and to keep this proprietary information confidential. *Id.* ¶ 18.

In 1993, Winklevoss asked to lease these programs from Lynchval. Lynchval refused when it learned that Winklevoss planned to develop a competing product. *Id.* ¶¶ 21–24. CCA, which used the LynchVal/LVMed products and had signed Lynchval's confidentiality agreement, later allegedly provided Winklevoss access to the LynchVal software. *Id.* ¶¶ 24–28, 66. Together, CCA and Winklevoss allegedly devised a rival product, "Proval." *Id.* ¶¶ 28, 105, 111, 119, 121. Proval, Lynchval claims, was "improperly developed with reference … to trade secret information of Lynchval Systems." *Id.* ¶ 86. Beginning in 1994, CCA and Winklevoss allegedly began marketing Proval as a team to Lynchval's existing and potential customers. *Id.* ¶¶ 29, 67, 86. These marketing efforts allegedly led one of Lynchval's customers to cancel its contract and switch from LynchVal to the "illicitly developed software, Proval." *Id.* ¶ 87.

To remedy these alleged torts and trade secret violations, Lynchval sought several types of damages. It also requested that CCA and Winklevoss be enjoined from, *inter alia*, using Lynchval's software, "providing any information obtained for the running of any Lynchval Systems software to non-client third parties," and promoting "any software which has been developed or modified through the unauthorized use of Lynchval Systems' software." *Id.* at 21 ¶ A. Lynchval's suit is still pending before the Honorable Blanche Manning in federal district court. Pls.' 12(M) Statement ¶ 9.

## II. Federal's Insurance Policies

Winklevoss tendered the original Lynchval complaint to Federal for a defense on April 6, 1995. Pls.' 12(M) Statement ¶ 11. Federal refused the tender, denying that it had a duty to defend the original complaint under Winklevoss' insurance policies. Def.'s 12(N) Response ¶ 11.

Winklevoss had purchased from Federal two policies, the Financial Institutions General Liability Insurance policy ("CGL policy") and the Commercial Umbrella Liability Insurance Policy ("Umbrella Policy"). Both were effective April 5, 1994 through April 5, 1995. The CGL policy pledges to

> pay damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of: … personal injury or advertising injury to which this insurance applies…. This insurance applies: … 2. to personal injury or advertising injury only if caused by an offense committed during the policy period.

CGL policy "Coverage" section at 1. With respect to defense obligations, the policy states, "We will defend any claim or suit against the insured seeking such damages. We will pay in addition to the applicable Limit of Insurance the defense expense. Our obligation to defend and pay for defense expense is limited as described under DEFENSE OF CLAIMS OR SUITS." *Id.* The CGL policy goes on to define "advertising injury" as

> injury arising solely out of one or more of the following offenses committed in the course of advertising your goods, products or services:

1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. oral or written publication of material that violates a person's right of privacy;

3. misappropriation of advertising ideas or style of doing business; or

4. infringement of copyrighted advertising materials, titles or slogans.

CGL policy "Common Policy Conditions" section at 9–10. The policy does not define these "offenses" in any more detail.

Winklevoss' Umbrella policy comprises two insuring agreements: an "Excess Follow Form Liability coverage," or "Coverage A"; and "Umbrella Liability coverage," or "Coverage B." The Umbrella policy's cover sheet defines these two types of coverage and describes the relationship between them:

Excess Follow Form Liability adds excess limits over scheduled underlying coverages.

Umbrella Liability adds a broadening measure of coverage against many of the gaps in and between the underlying coverages.

Together, these separate coverages share the Limits of Insurance.

Coverage A provides coverage "in excess of the total applicable limits of underlying insurance." It incorporates the underlying CGL policy's terms and conditions "except with respect to: A. any contrary provision contained in this policy; or B. any provision in this policy for which a similar provision is not contained in the underlying insurance. With respect to the exceptions above, the provisions of this policy will apply." Umbrella policy at 1. Coverage A also explains, "Notwithstanding anything to the contrary contained above, if underlying insurance does not cover loss ... then we will not cover such loss." *Id.*

Coverage B is as follows:

Under Coverage B, we will pay on behalf of the insured, damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of ... advertising injury covered by this insurance which takes place during the Policy Period of this policy [sic] and is caused by an occurrence. We will pay such damages in excess of the Retained Limit Aggregate specified in Item 4 d. of the Declarations or the amount payable by other insurance, whichever is greater.

Coverage B will not apply to any loss, claim or suit for which insurance is afforded under underlying insurance....

Umbrella policy at 2. Coverage B defines an "occurrence ... with respect to personal injury or advertising injury, [as] a covered offense." *Id.* at 14.

Finally, the umbrella policy is subject to two endorsements: an amended definition and an exclusion. Endorsement 2 amends the definition of advertising injury for both Coverage A and Coverage B by replacing it with the advertising injury definition in the underlying CGL policy. Endorsement 3, however, excludes advertising injury from Coverage B: "It is agreed that, with respect to Coverage B, all references in the policy to advertising injury are deleted and no coverage is provided."

Winklevoss contends that the CGL and Umbrella policies' provisions on "advertising injury" trigger a duty to defend Lynchval's original allegations.

### III. Procedural History

About a year after Federal's April 1995 refusal to defend the original Lynchval complaint, Winklevoss tendered Lynchval's Second Amended Substitute Complaint to Federal for a defense. Winklevoss Complt. ¶ 18. Because the second amended complaint added allegations that Winklevoss disparaged Lynchval's software products, Federal conceded that the amended complaint held the potential for liability under the listed offense "oral or written publication of material that ... disparages a person's or organization's goods, products or services." *Id.* Ex. 4. Consequently, Federal agreed to defend the *Lynchval* action based on the second amended complaint, subject to a reservation of rights. *Id.* ¶ 21.

On March 10, 1997, Winklevoss filed a two-count complaint in this Court seeking a declaratory judgment that Federal had a duty to defend Winklevoss against the original Lynchval complaint, and that its refusal to defend the original complaint breached Winklevoss' insurance contract.[3] Winklevoss claimed that Federal's "advertising injury"[4] provisions activated defense obligations.[5] *Id.* ¶ 27. After the parties filed cross-motions for summary judgment on the issue of Federal's duty to defend the original complaint, Federal filed a counterclaim seeking to withdraw its defense under the second amended complaint, claiming that the second amended complaint's defense-triggering allegations had been dismissed from the case. Winklevoss filed a motion to stay any consideration of Federal's counterclaim, pointing out that it would be moot if this Court rules that Federal had a duty to defend the original allegations—all of which remain in the second amended complaint. *See Maryland Cas. Co. v. Peppers,* 64 Ill.2d 187, 194, 355 N.E.2d 24, 28 (1976) (duty to defend "extends to cases where the complaint alleges several causes of action ... one of which is within the coverage of a policy while the others may not be."). This Court granted Winklevoss' motion to stay.

Cutting through this rather convoluted history, the Court discerns the following issues and implications. First, we must decide whether Federal had a duty to defend Winklevoss against Lynchval's original complaint under the policies' advertising injury provisions. If so, then Federal breached its contract to defend Winklevoss, and its counterclaim is moot. A determination of Federal's

indemnity obligations, if any, would be left for a later day. If, on the other hand, we find that Federal had no duty to defend the original complaint, we would still need to resolve Federal's counterclaim, that is, whether the second amended complaint still contains allegations that precipitate a duty to defend. In short, summary judgment in either party's favor does not end this suit; it simply narrows the issues.

After carefully reviewing all the relevant pleadings, this Court finds that Federal did not have an obligation to defend the original *Lynchval* complaint. Federal's motion for summary judgment is therefore granted, and Winklevoss' motion for summary judgment is denied.

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). When the parties submit cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Buttitta v. City of Chicago,* 803 F.Supp. 213,

---

**3.** Winklevoss also requested a declaration that Federal "had and has a duty to indemnify Winklevoss for all damages awarded in the *Lynchval* action," and that its refusal to do so breached the insurance contract. Earlier this year, however, this Court issued a ruling that it would not determine Federal's indemnity obligations until the underlying suit concluded.

**4.** Although Winklevoss' complaint claimed a duty to defend under Federal's "personal injury" provisions as well, it abandoned this contention in its brief, arguing defense obligations based solely on the policies' "advertising injury" provisions.

**5.** Despite Federal's decision to defend based on Lynchval's second amended complaint, which re-

placed the original complaint, *see* 6 Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice and Procedure § 1476, at 556–57 (2d ed.1990), the issue of whether Federal breached the insurance contract by refusing to defend the original complaint remains a live controversy. Neither party claims that Federal's later actions cured the alleged contractual breach. Moreover, a declaration that Federal has a duty to defend the original complaint would override Federal's reservation of rights to defend the amended complaint, which incorporates all the original allegations. *See Maryland Cas. Co. v. Peppers,* 64 Ill.2d 187, 194, 355 N.E.2d 24, 28 (1976) (insurer must defend entire action if any part of complaint is covered).

217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993). This is more of a semantic exercise here because both parties' motions spotlight the same issue: did Federal have a duty to defend Winklevoss against the original *Lynchval* complaint?

The material facts are undisputed and resolving the pending motion depends, not upon drawing reasonable inferences, but upon applying the relevant law to the factual allegations in the underlying complaint. In other words, this Court need only look to the allegations made against the insured and decide whether, if proven, those allegations would establish an injury that the policy covers.

## II. An Insurer's Duty to Defend

Under Illinois law,[6] the interpretation of an insurance policy is a question of law. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 391, 189 Ill.Dec. 756, 620 N.E.2d 1073, 1077 (1993). The insurance company's duty to defend under an insurance policy is broader than its duty to indemnify, and is determined by comparing the allegations in the underlying complaint to the relevant insurance policy provisions. *Hurst–Rosche Eng'rs. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir. 1995); *Crum & Forster*, 156 Ill.2d at 393, 189 Ill.Dec. 756, 620 N.E.2d at 1079. "If the facts alleged in the underlying complaint fall within or even potentially within policy coverage, the insurer has a duty to defend its insured against the complaint." *United States Fire Ins. Co. v. Aetna Life & Cas.*, 291 Ill.App.3d 991, 225 Ill.Dec. 965, 684 N.E.2d 956, 960–61 (1997) (citations and internal quotations omitted). The court must construe the underlying complaint liberally, resolving all doubts in the insured's favor. *Id.*, 225 Ill.Dec. 965, 684 N.E.2d at 961. The key "is not the legal label that the [underlying] plaintiff attaches to the [insured's] conduct, but whether that conduct as alleged in the complaint is at least arguably within one or more of the categories of wrongdoing that the policy covers." *Curtis–Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1122 (7th Cir.1994). If any por-

tion of the complaint is covered, the insurer is obligated to provide a complete defense to all the claims. *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.*, 144 Ill.2d 64, 74, 161 Ill.Dec. 280, 578 N.E.2d 926, 930 (1991).

The insurance policy must be read as a whole to ascertain the parties' intent. *Crum & Forster*, 156 Ill.2d at 391, 189 Ill.Dec. 756, 620 N.E.2d at 1078. "If the words in the policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written." *Id.* But "if the words in the policy are susceptible to more than one reasonable interpretation, they are ambiguous and will be construed in favor of the insured and against the insurer who drafted the policy." *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill.2d 90, 108–09, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992). Courts may not strain the policy language in search of an ambiguity. *Crum & Forster*, 156 Ill.2d at 391, 189 Ill. Dec. 756, 620 N.E.2d at 1078. Keeping these well-settled principles in mind, we move on to consider Federal's obligation to defend the original *Lynchval* complaint.

## ANALYSIS

Our task is to decide whether the original *Lynchval* allegations fit potentially within Federal's policy coverage for advertising injury. "Advertising injury" is defined in the CGL policy as "injury arising solely out of one or more of the following offenses committed in the course of advertising your goods, products or services." The policy lists four covered offenses:

1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

2. oral or written publication of material that violates a person's right of privacy;

3. misappropriation of advertising ideas or style of doing business; or

---

**6.** Neither party disputes that Illinois law governs this action.

4. infringement of copyrighted advertising materials, titles or slogans.

These provisions boil down to three components: (1) the insured must have engaged in advertising activity; (2) the underlying complaint must contain allegations that fit one of the enumerated offenses; and (3) the injury to the underlying plaintiff must have arisen solely out of the insured's offense committed in the course of its advertising. *See, e.g., New Hampshire Ins. Co. v. R.L. Chaides Constr. Co.*, 847 F.Supp. 1452, 1455 (N.D.Cal. 1994).[7]

In its opening brief, Winklevoss vigorously argues that it engaged in advertising activity by promoting its competing software product to Lynchval's current and potential customers. Winklevoss also claims that, in the original complaint, it was alleged to have misappropriated Lynchval's trade secrets and then wrongfully exposed them. According to Winklevoss, these allegations fit the enumerated offense "misappropriation of advertising ideas or style of doing business." Winklevoss maintains that this offense occurred in the course of its advertising, i.e., while it was marketing the rival Provall product, and that an injury—the loss of business—arose out of the offense.

Winklevoss' combined response and reply brief adds that the original *Lynchval* complaint alleges facts falling within the remaining three enumerated offenses as well: "oral or written publication of material that ... disparages a person's or organization's goods, products, or services"; "infringement of ... titles"; and "oral or written publication of material that violates a person's right of privacy."[8] Winklevoss claims that these offenses were also committed in the course of advertising and that injuries arose from them.

Federal disputes all these contentions. First, it takes issue with Winklevoss' definition of "advertising activity," arguing that the Seventh Circuit defines the phrase as "widespread distribution of promotional materials," not one-on-one solicitation. Second, Federal maintains that neither the trade secret misappropriation nor any other original *Lynchval* allegations fits an enumerated offense. Finally, Federal urges that Illinois law requires a causal link between the insured's advertising activities and the alleged advertising injury. This link, Federal argues, is nowhere to be found in the *Lynchval* complaint. According to Federal, the injury alleged is Winklevoss' use of Lynchval's trade secrets in developing a competing product, not wrongful trade secret disclosure during Winklevoss' marketing activities.

For purposes of this opinion, we will assume that Winklevoss' promotional and marketing efforts constitute "advertising."[9]

---

**7.** Despite the proliferation of advertising injury insurance coverage suits, relevant Illinois and Seventh Circuit case law is sparse, and focuses primarily on the definition of "advertising activity." Accordingly, we rely on other jurisdictions that apply similar insurance contract interpretation principles. *See Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir.1996) (when state supreme court has not confronted a state law issue, court may "consider relevant authority of other jurisdictions that have addressed the issue."). The Ninth Circuit has particularly well-developed jurisprudence in this area.

**8.** Ordinarily, we would not consider these arguments because Winklevoss did not raise them in its opening brief. *See Strehl v. Case Corp.*, 1997 WL 695729, at *2 (N.D.Ill. Nov.4, 1997) ("A litigant who fails to raise an argument until his reply brief will be deemed to have waived that argument.") (quoting *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 439 (7th Cir.1994)). Because Federal's summary judgment papers assert the absence of these offenses, however, Winkle-

voss' contentions are fairly characterized as a response to arguments raiser, by Federal.

**9.** The appropriate definition of advertising under Illinois law is by no means a settled issue. In *Playboy Enters. v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 429 (7th Cir.1985), the court interpreted an insurance policy provision excluding offenses in the course of advertising to eliminate coverage only for offenses committed through "widespread distribution of promotional material to the public at large." *Playboy* is distinguishable from this case because it involved an exclusionary provision, which is construed strictly against the insurer and interpreted as narrowly as possible. But other courts have cited the narrow *Playboy* definition when interpreting coverage provisions as well. *See Davila v. Arlasky*, 857 F.Supp. 1258, 1262 (N.D.Ill.1994); *International Ins. Co. v. Florists' Mut. Ins. Co.*, 201 Ill.App.3d 428, 433, 147 Ill.Dec. 7, 559 N.E.2d 7, 10 (1990). The Seventh Circuit explained the propriety of a uniform "advertising" definition, whether in a coverage provision or an exclusion,

Winklevoss' motion for summary judgment still fails, though, because Winklevoss cannot satisfy the remaining two elements. None of Lynchval's original allegations even arguably fits an enumerated offenses. Moreover, the complaint cannot be read to allege a covered offense that Winklevoss committed in the course of its promotional activities.

## I. The Trade Secret Violations Were Not Committed in the Course of Advertising

■ Because the parties devote the bulk of their argument to the third element, we begin there. We will assume, for the moment, that the trade secret violations alleged in *Lynchval* constitute a covered offense. We must decide then, under the policy language, whether this offense occurred in the course of advertising. We hold that it did not.

Judge Will examined the "in the course of advertising" requirement in *Davila v. Arlasky*, 857 F.Supp. 1258 (N.D.Ill.1994). The insured in *Davila* had been sued for selling a product that infringed a competitor's patent. The insurer sought a declaration that it had no duty to defend the suit under its policy's advertising injury provisions, which are materially identical to those before us.[10] Judge Will agreed with the insurer, holding that "there must be a causal connection between the advertising activity and the patent infringement...." *Id.* at 1263. The infringement was caused not by advertising activity, but "by the manufacture, use, and sale of an allegedly infringing product." *Id.* That the insured advertised the infringing product, or

sold the product through advertisements, was irrelevant; including such conduct within the scope of advertising injury would drastically expand coverage beyond the reasonable expectations of the insured, covering "any tortious acts of. the seller just because the product was advertised." *Id.* at 1262–63.

The Ninth Circuit employed the same reasoning under circumstances even more compelling than *Davila*—claims for advertising injury coverage based on trade secret misappropriation allegations. In *Sentex Sys., Inc. v. Hartford Accident & Indem. Co.*, 93 F.3d 578 (9th Cir.1996), the court affirmed a finding that the insured's alleged misappropriation of customer lists and marketing techniques fell within the boundaries of advertising injury. But it was quick to point out: "It is significant that ESSI's claims for misappropriation of trade secrets relate to marketing and sales and not to secrets relating to the manufacture and production of security systems." *Id.* at 580.

In *Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219 (9th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 388, 136 L.Ed.2d 304 (1996), the court fashioned this dicta into authority, using this principle to affirm the district court's' ruling that the alleged trade secret violations did not claim advertising injury.[11] In the underlying state court action, the insured's competitor alleged that the insured had misappropriated its "secret automated process for slicing fruit" by hiring its former employees, who then assisted the insured in developing a similar fruit-cutting device. *Id.* at 1220. In holding that

---

in *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 894 (7th Cir.1996). The word "advertising," the court emphasized, is not an ambiguous term. As such, it should be given its "plain, ordinary meaning," which does not necessarily favor the insured. *Id.* at 895. The court did not decide whether that plain, ordinary meaning requires widespread distribution of promotional material, but pointed out that the "clear majority of cases addressing the issue ... have found the term 'advertising' to unambiguously refer to widespread distribution of promotional material to the public." *Id.* at 894 n. 2. The court held only that "advertising" means, at the very least, "active solicitation of business." *Id.* at 894. Still, the court warned that stretching the term to "encompass fringe activity is irrelevant if that result is contrary to plain meaning." *Id.* at 895.

We decline to resolve this issue today, for endorsing a particular definition of advertising could have broad implications for what is, in this Circuit, a fledgling area of jurisprudence.

10. The policy defined "advertising injury" as "injury arising out of an offense committed during the policy period occurring in the course of the named insured's advertising activities...." *Davila*, 857 F.Supp. at 1261. The policy went on to list the covered offenses.

11. The policy in *Simply Fresh* provided coverage for advertising injury "caused by an offense committed: (1) in the 'coverage territory' during the policy period; and (2) in the course of advertising [the insured's] goods or services." *Id.* at 1220.

these allegations did not claim advertising injury, the court relied on its recent decision in *Microtec Research, Inc. v. Nationwide Mut. Ins. Co.*, 40 F.3d 968 (9th Cir.1994). *Microtec* held that the underlying suit must "allege wrongdoing with respect to [the plaintiff's] advertisements," not just in connection with the plaintiff's product. *Id.* at 1222 (internal quotations and citations omitted). The underlying complaint in *Simply Fresh* fell into the latter category because, according to the underlying complaint, the "harm ... is allegedly caused by misappropriation of the [trade secret], not by the advertising itself." *Id.* (internal quotations and citations omitted). In closing, the court emphasized that, in order to trigger defense obligations, "the advertising activities must cause the injury—not merely expose it." *Id.* at 1223.

In this case, all the allegations of trade secret misappropriation are limited to Winklevoss' development of a competing product—conduct that took place long before Winklevoss began its promotional efforts. Consequently, even if trade secret misappropriation were a covered offense, the misappropriation alleged here did not occur in the course of advertising.

Focusing on the words in the complaint and resolving all doubts and ambiguities in favor of Winklevoss, it is clear that Winklevoss' alleged trade secret offense is limited to developing Proval. Lynchval explains the process by which Winklevoss and CCA allegedly misappropriated its trade secrets:

> 60. In developing a competing software, it becomes necessary to determine whether the calculations performed by the competing software provide the same results as the original software, and to determine this, data can be run through the original software and the developing competing software with various parameters to see if similar results are achieved.
> 61. The parameters can be selectively modified to determine if similar changes in results are achieved between the two software programs.
> 62. By comparing the two outputs, it becomes much easier to check and modify the calculations performed in the competing software so as to determine quite precisely the proprietary calculations performed by the original software, thus obtaining the trade secret.

Lynchval Complt. at 11. From that point forward, the complaint repeatedly refers to the "illicitly developed" or "improperly developed" Proval software, confirming that the trade secret violation lay in devising a competing product. Indeed, Count VI, the Illinois Trade Secret Act claim, asserts that "Winklevoss, by inducing CCA to provide it with information regarding the Lynchval Systems software, has acted in violation of the Illinois Trade Secrets Act."

Contrary to Winklevoss' contentions, the *Lynchval* complaint never alleges that Winklevoss wrongfully disclosed trade secret information to third parties in its promotional dealings. Winklevoss imagines that its product demonstrations to potential clients must have revealed trade secret information—since Lynchval alleges that "mere use of the program would enable a competitor to much more quickly develop a competing product." But no wrongful disclosure allegations appear in the complaint. The only party accused of wrongful disclosure is CCA: "CCA, by providing information to Winklevoss, obtained from the running of Lynchval Systems' software, in violation of the lease provisions, has acted in violation of the Illinois Trade Secrets Act." Lynchval Complt. ¶ 103.

Although we must construe the complaint liberally in favor of Winklevoss, we cannot read into it words or claims that do not appear. If Lynchval wanted to press the claim that Winklevoss' promotional activities revealed trade secrets, it could have included these allegations in the paragraphs discussing Winklevoss' marketing efforts. But the only trade secret violations mentioned are CCA's wrongful disclosure to Winklevoss and Winklevoss' improper use of trade secrets to develop Proval:

> 66. Upon information and belief, CCA has provided Winklevoss with either the results of the runs through the Lynchval software, or with information learned through comparison runs, so as to permit Winklevoss to make changes and modifica-

tions to its software, to more closely emulate the software.

. . . .

86. Upon information and belief, CCA and Winklevoss have approached other companies, with whom Lynchval Systems has a contractual relationship, and has offered to license or lease to them, Proval software *which was improperly developed with reference*, by CCA and Winklevoss, *to trade secret information* of Lynchval Systems.

87. Such approaches have resulted in at least one contractual client of Lynchval Systems canceling its contract and beginning use of CCA's *illicitly developed* software, Proval.

88. Due to the *improper and illicit development* of the Proval software, CCA's and Winklevoss' actions constitute tortious interference with Lynchval Systems' contractual relationships.

120. CCA and Winklevoss have been actively promoting the *illicitly developed* competing software product, Proval, to others in competition with Lynchval Systems.

121. Due to the *improper development* of the competing Proval software, such promotion by CCA and Winklevoss constitutes unfair competition.

Lynchval Complt. at 12, 15, 20 (emphasis added). The paragraphs allege trade secret theft in the course of product development, not during product demonstrations, promotional contacts, or marketing.[12]

■ *Davila, Sentex* and *Simply Fresh* hold that advertising an illicitly developed product is not an advertising injury. The fact that Winklevoss exposed the product through marketing efforts to potential customers is of no consequence. *See Simply Fresh*, 94 F.3d at 1223 ("advertising activities must cause the injury—not merely expose it"). To meet the "in the course of advertising" requirement, these cases make plain that advertising activity must be the source of the offense, that the covered wrongdoing must at the very least relate to marketing, not to manufacture or production.[13] *Davila,*

---

12. Winklevoss does not contend that the tortious interference or unfair competition allegations constitute covered offenses.

13. The vast majority of jurisdictions, including Illinois, are in accord. *See, e.g., Home Ins. Co. v. American Nat'l Can Co.*, 1997 WL 467180, at *3 (N.D.Ill. Aug.12, 1997) ("[T]he circumstances here indicate that the presence of ANCC's infringing products in the marketplace and the competitive pressure ANCC created by selling these products—not the presence of ANCC's advertisements—prevented Viskase from raising its prices and thereby damaged Viskase's profits. In sum, I conclude that the record shows that no connection existed between ANCC's advertising activities and Viskase's injuries that triggered The Home's duty to defend."); *International Ins. Co. v. Florists' Mut. Ins. Co.*, 201 Ill.App.3d 428, 433, 147 Ill.Dec. 7, 559 N.E.2d 7, 10 (1990) ("The fact that the purpose of FTD's Rule 18(b) was to protect its advertising investment is of no consequence when the injury [antitrust violations] is alleged to have been caused, not by the advertising, but by the rule."); *see also Advance Watch Co. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 806–07 (6th Cir.1996) ("The policy therefore requires some nexus between the ground of asserted liability and the insured's advertising activities before there is coverage or a duty to defend.... However, it was not Advance's advertising in itself which provoked Cross' claim; it was the fact that in each advertisement which depicted a Pierre Cardin writing instrument, there was, according to Cross, a writing instrument deceptively similar in shape and appearance to Cross' writing instruments."); *Robert Bowden, Inc. v. Aetna Cas. & Sur. Co.*, 977 F.Supp. 1475, 1480 (N.D.Ga.1997) ("In other words, an insured's advertising must have been the cause of whatever injury is alleged in the underlying suit."); *New Hampshire Ins. Co. v. R.L. Chaides Constr. Co.*, 847 F.Supp. 1452, 1456–57 (N.D.Cal.1994) ("the mere advertising of a potentially infringing device does not itself constitute infringement.... The acts of making, selling, or using simply do not arise out of the insured's advertising activities."); *National Union Fire Ins. Co. v. Siliconix Inc.*, 729 F.Supp. 77, 80 (N.D.Cal.1989) ("It is undisputed that Siliconix did, in fact, advertise the products which form the basis of the underlying infringement action. Although defendant's argument is facially appealing, it contains a fundamental flaw in that it reads the requirement that the infringement occur in the course of advertising into the policy."); *GAF Sales & Serv., Inc. v. Hastings Mutual Ins.* Co., 224 Mich.App. 259, 264, 568 N.W.2d 165, 168 (1997) ("The underlying complaint does not allege any injuries that resulted from plaintiffs' advertising. Instead, the complaint alleges injuries from plaintiffs' purchase and resale of copyrighted software."); *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1275, 10 Cal.Rptr.2d 538, 833 P.2d 545, 558 (1992) (coverage for advertising injury does not mean that "any harmful act, if it were

857 F.Supp. at 1263; *Sentex,* 93 F.3d at 580; *Simply Fresh,* 94 F.3d at 1223. The original *Lynchval* complaint is devoid of allegations that Winklevoss committed trade secret misappropriation in connection with marketing or promoting Proval—there are no claims that Winklevoss stole Lynchval's proprietary marketing materials or customer lists, for example. The complaint instead circumscribes Winklevoss' trade secret violations to its misappropriation of Lynchval's proprietary mathematical formulas and user input questions—information allegedly used in producing a competing software package.

■■■ Winklevoss nevertheless insists that its promotional activities caused Lynchval harm—lost revenue, profits, and customers—satisfying the advertising injury requirement. *See* Lynchval Complt. ¶¶ 87, 90, 95, 107. Winklevoss also maintains that Lynchval's requested relief establishes advertising injury because the complaint seeks to enjoin Winklevoss from (1) promoting any software developed using Lynchval software, and (2) providing third parties with information obtained by running Lynchval software. *Id.* ¶¶ 121.A.2., 121.A.4. These points have no merit—the "harm" argument fails to tie advertising activities to a covered offense, and the injunction argument lacks a connection with advertising.

First, what Winklevoss portrays as injuries did not "ar[ise] solely out of" a covered offense "committed in the course of advertising your goods, products or services," as Federal's policy requires. To the extent Lynchval's profit, revenue, and customer losses arose solely out of Winklevoss' trade secret misappropriation (assuming for now that this

is a covered offense), the misappropriation was not, we held above, committed "in the course of advertising." Any other injuries did not "aris[e] solely out of" a covered offense, but instead arose out of other misconduct—perhaps tortious interference with contractual and business relationships or unfair competition—misconduct that Winklevoss does not even attempt to characterize as covered offenses.

Lynchval's requests for injunctive relief also lack the needed links between advertising, injury, and offense. As explained earlier, promoting an illicitly developed product is not advertising injury; that Lynchval has asked the court to prohibit Lynchval from doing so does nothing to change the allegations' substance. Lynchval's request to enjoin Winklevoss from "providing any information obtained from the running of any Lynchval Systems software to nonclient third parties" likewise fails to allege advertising injury for two reasons: this request for relief does not mention advertising and it does not claim that Winklevoss ever disclosed trade secrets in the course of advertising.[14] The entire complaint, construed liberally in Winklevoss' favor, is concerned with Winklevoss misappropriating trade secrets to develop a competing product, not with anything Winklevoss said or did while promoting the product.

It is telling that Winklevoss cites no decisions equating trade secret misappropriation with advertising injury. Instead, it claims analogy to *DecisionOne Corp. v. ITT Hartford Ins. Group,* 942 F.Supp. 1038 (E.D.Pa. 1996), which held that allegations of false

advertised in some way, would fall under the grant of coverage merely because it was advertised."). Cf. *Massachusetts Bay Ins. Co. v. Penny Preville, Inc.,* 1996 WL 389266 (S.D.N.Y. July 10, 1996) (where complaint alleges that advertisement and sale of "knock-off" product causes harm "it would be artificial to deny coverage by constructing a distinction between the injuries arising from the manufacture and sale of infringing goods and injuries arising from the marketing of these same goods by means of display or advertisement of the goods.").

14. Winklevoss cites three cases for its argument that Lynchval's request to enjoin Winklevoss from providing proprietary information to third

parties constitutes an advertising injury. *See Penetone Corp. v. Palchem, Inc.,* 627 F.Supp. 997 (N.D.Ohio 1985); *Permagrain Prods., Inc. v. U.S. Mat & Rubber Co.,* 489 F.Supp. 108 (E.D.Pa. 1980) and *Laff v. John O. Butler Co.,* 64 Ill. App.3d 603, 21 Ill.Dec. 314, 381 N.E.2d 423 (1978). None of these cases sustains this proposition—these opinions do not even deal with insurance coverage. *Penetone* simply supports granting an injunction against wrongful trade secret disclosure in cases that actually allege it. *Laff* and *Permagrain* make the obvious point that publicly exposing a trade secret can compromise its protected status. There is absolutely nothing in these opinions to suggest that the injunctive relief *in this case* alleges advertising injury through wrongful disclosure of trade secrets.

advertising under the Lanham Act satisfied policy advertising injury provisions. The underlying claim in *DecisionOne* alleged that the insured had made false and misleading comparisons between it and the claimant, causing customer defection. *Id.* at 1042. The court held that these allegations fit the covered policy offense of disparagement, which the court defined as " '[a] statement about a competitor's goods which is untrue or misleading and is made to influence or tends to influence the public not to buy.' " *Id.* at 1043 (quoting *Black's Law Dictionary* (6th ed.1990)). Because the "wrongful acts causing continued harm include [insured's] false promotion and advertisement ... and false comparisons to [claimant]," the allegations established the requisite causal connection between wrongdoing and advertising activity. *Id.* Although the claimant had alleged trade secret violations as well, the court went out of its way to point out that "[claimant] is not alleging harm solely from theft of trade secrets.... It also alleges injury from [the insured's] advertising."[15] *Id.* at 1042 n. 1.

Allegations that an insured's advertisements made false comparisons to a competitor forge a strong link between misconduct and advertising. But in this case, Winklevoss cannot point to any allegations claiming trade secret misappropriation in connection with Winklevoss' promotional efforts. The harm lay in Proval's development, which transpired long before Winklevoss began marketing the product.

The remainder of Winklevoss' authority is just as easily distinguished. Challenging the need for a causal connection between advertising injury and advertising activity, Winklevoss cites a number of cases that it claims dispense with this requirement.[16] But these cases fail to aid Winklevoss on two fronts. First, they all involve claims of trademark or trade dress infringement, which many courts have held "inherently involve advertising ac-

tivity." *Poof Toy Prods., Inc. v. United States Fidelity & Guar. Co.,* 891 F.Supp. 1228, 1235 (E.D.Mich.1995); *see Dogloo, Inc. v. Northern Ins. Co.,* 907 F.Supp. 1383, 1391 (C.D.Cal.1995) (" '[t]rademark or tradename infringement ... necessarily involves advertising' ") (quoting *J.A. Brundage Plumbing & Roto–Rooter, Inc. v. Massachusetts Bay Ins. Co.,* 818 F.Supp. 553 (W.D.N.Y.1993)). The *Poof Toy* court based this conclusion on the need to prove in every trademark and trade dress case the likelihood of consumer confusion or deception. 891 F.Supp. at 1236 ("To have (or potentially cause) this effect, one must clearly advertise (announce to the intended customers) the mark or dress.") (citing 15 U.S.C. § 1125(a)). In contrast, proof of advertising is not an essential element of trade secret misappropriation.

Second, all but one of these cases apply the same causation requirement as *Davila, Sentex,* and *Simply Fresh;* that is, they adhere to the majority rule that the alleged offense must be caused by advertising. In *Dogloo,* the court agreed with the insurer that "the infringement need be committed in an advertisement rather than in the sale of a product in order to be covered." 907 F.Supp. at 1390–91 (citation and internal quotations omitted). The underlying Lanham Act false advertising claims established the requisite tie to advertising. *Id.* at 1391. The *Poof Toy* court, having already found insurance coverage for trademark and trade dress infringement, next addressed underlying copyright infringement claims, explaining that "[w]here the complaint does not identify any connection between the copyright claims and the advertising activity, there is no duty to defend." 891 F.Supp. at 1235. The court found the necessary connection to advertising in allegations that the insured had infringed the plaintiff's copyrights and trademarks by selling her toys at Target stores under the insured's label. *Id.* at 1230, 1235.

---

**15.** The insurance company argued that the "gravamen" of the underlying claim was trade secret misappropriation, a breed of misconduct that it claimed was not covered under any of the policy's advertising injury offenses.

**16.** *See Dogloo, Inc. v. Northern Ins. Co.,* 907 F.Supp. 1383 (C.D.Cal.1995); *Poof Toy Prods.,*

*Inc. v. United States Fidelity & Guar. Co.,* 891 F.Supp. 1228 (E.D.Mich.1995), *B.H. Smith, Inc. v. Zurich Ins. Co.,* 285 Ill.App.3d 536, 221 Ill. Dec. 700, 676 N.E.2d 221 (1996), *First State Ins. Co. v. Alpha Delta Phi Fraternity,* 39 U.S.P.Q.2d 1905, 1995 WL 901452 (1995).

In *First State Ins. Co. v. Alpha Delta Phi Fraternity,* an unpublished Illinois appellate court case,[17] the court found a duty to defend under advertising injury provisions because "the advertising injuries incurred ... are alleged to have been proximately caused by defendants' advertising activities." 39 U.S.P.Q.2d 1905, 1914, 1995 WL 901452 (1995). The underlying complaint alleged that the insured local fraternity had infringed the international fraternity's trademarks in several ways. The local chapter had displayed fraternity letters on the insured's house without authorization; listed itself as an Alpha Delta Phi chapter in phone books, newsletters, and correspondence; and misrepresented itself in solicitations for alumni contributions. The court began by characterizing these activities as advertising, *id.* at 1911–12, then went on to find that the insured's use of the plaintiff's marks in this advertising caused the plaintiff's injury. *Id.* at 1914. Finally, the court in *B.H. Smith, Inc. v. Zurich Ins. Co.,* 285 Ill.App.3d 536, 221 Ill.Dec. 700, 676 N.E.2d 221 (1996), was silent on the causation requirement. The court emphasized, however, that "[our] conclusion is based strictly on New York law," which it admitted interprets advertising injury broadly—far more broadly, we have found, than Illinois or any other jurisdiction.[18] Moreover, *B.H. Smith* dealt with trademark claims, which, as we observed above, inherently involve advertising activity.

In short, both the weight of authority and the particular allegations here compel a finding that Winklevoss cannot satisfy the "in the course of advertising" requirement for its alleged trade secret violations. As such, Winklevoss fails one of three prerequisites to triggering defense obligations under its insurance policies' advertising injury provi-

sions. But Winklevoss' alleged trade secret misappropriation is deficient for an independent reason—it is not a covered offense.

## II. Trade Secret Misappropriation is Not Misappropriation of Advertising ideas or a Style of Doing Business

█ Even if the alleged trade secret misappropriation occurred in the course of advertising, Winklevoss must still demonstrate that these allegations fit an enumerated offense in the policy's advertising injury provisions.[19] The policy lists four, none of which explicitly covers trade secret misappropriation. Winklevoss argues most forcefully that its alleged trade secret misappropriation satisfies the third covered offense, "misappropriation of advertising ideas or style of doing business." [20] For purposes of the above discussion, we assumed this was true. Analysis of the policy language reveals that it is not.

"In construing an insurance policy, the primary function of the court is to ascertain and enforce the intentions of the parties as expressed in the agreement." *Crum & Forster Managers Corp. v. Resolution Trust Corp.,* 156 Ill.2d 384, 391, 189 Ill.Dec. 756, 620 N.E.2d 1073, 1078 (1993). Ambiguities are construed in favor of the insured, while unambiguous words take on their plain, ordinary meaning. *Outboard Marine Corp. v. Liberty Mutual Ins. Co.,* 154 Ill.2d 90, 108–09, 180 Ill.Dec. 691, 607 N.E.2d 1204, 1212 (1992). Winklevoss maintains that the phrase "misappropriation of advertising ideas or style of doing business" is ambiguous or, at the very least, enjoys a broad range of meanings encompassing trade secret misappropriation. This Court agrees that the language is susceptible of more than one reasonable interpretation. But even accepting the

---

**17.** Under Illinois Supreme Court Rule 23, unpublished orders have no precedential value.

**18.** *See supra* note 13.

**19.** To satisfy Federal's policy provisions on advertising injury, the alleged injury must arise solely out of one of the following offenses committed in the course of advertising:

   1. oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

   2. oral or written publication of material that violates a person's right of privacy;

   3. misappropriation of advertising ideas or style of doing business; or

   4. infringement of copyrighted advertising materials, titles or slogans.

CGL policy "Common Policy Conditions" section at 9–10.

**20.** We address Winklevoss' contentions with respect to the other covered offenses in the next section.

interpretation most favorable to Winklevoss, we cannot conclude that trade secret theft falls within it.

Although "misappropriation of advertising ideas or style of doing business" is a common CGL policy advertising offense, few courts have explored its meaning in depth. All agree that the phrase really comprises two offenses—misappropriating advertising ideas and misappropriating a style of doing business—either of which, if shown, is sufficient. *See, e.g., Advance Watch Co. v. Kemper Nat'l Ins. Co.,* 99 F.3d 795, 800 (6th Cir.1996). But some of the terms provoke disagreement. For example, the word "misappropriation" has been assigned dueling definitions: a technical, legal meaning that tracks the common-law tort of misappropriation, *see Advance Watch Co.,* 99 F.3d at 804; *Atlantic Mut. Ins. Co. v. Badger Medical Supply Co.,* 191 Wis.2d 229, 237, 528 N.W.2d 486, 489–90 (Ct.App.1995); and the general lay meaning "to take wrongfully," *see Lebas Fashion Imports v. ITT Hartford Ins. Group,* 50 Cal. App.4th 548, 561, 59 Cal.Rptr.2d 36, 44 (1996). Likewise, the term "advertising" has variously been interpreted, at its narrowest, as the "widespread distribution of promotional material to the public at large," *see Playboy Enters. v. St. Paul Fire & Marine Ins. Co.,* 769 F.2d 425, 429 (7th Cir.1985), and, at its broadest, as the "active solicitation of business," *Erie Ins. Group v. Sear Corp.,* 102 F.3d 889, 894 (7th Cir.1996).

Consistent with principles of Illinois insurance policy interpretation, we favor the insured by affording these terms their broadest possible meaning, but will not strain them to create obligations the parties never envisioned. The most liberal interpretation of the phrase "misappropriation of advertising ideas or style of doing business" is found in *Lebas Fashion Imports v. ITT Hartford Ins. Group,* a duty to defend case with underlying allegations of trademark infringement. Approaching the policy language from a layperson's point of view, the court found that "misappropriation of advertising ideas or style of doing business" encompasses trademark claims. 50 Cal.App.4th at 562–63, 59 Cal.Rptr.2d at 44. The court ascribed to the word "misappropriation" its "general mean-

ing of 'to take wrongfully' " and rejected the insurer's invitation to interpret the word in a "technical common law sense." *Id.* at 562, 59 Cal.Rptr.2d at 44. The court went on to define the full "misappropriation of advertising ideas" offense:

> [W]hile the misappropriation of an "advertising idea" certainly would include the theft of an advertising plan from its creator without payment, it is also reasonable to apply it to wrongful taking of the manner or means by which another advertises its goods or services. As we have already explained, one of the basic functions of a trademark is to advertise the product or services of the registrant.

*Id.* The same rationale supported finding a trademark to be an "integral part of an entity's 'style of doing business.' " *Id.*

Combining the *Lebas* formulation with the Seventh Circuit's most generous definition of advertising, we conclude that the trade secret misappropriation here does not fall within the covered offense "misappropriation of advertising ideas." The Seventh Circuit held in *Erie Ins. Group v. Sear Corp.* that advertising requires, at the very least, the active solicitation of business. 102 F.3d at 894. Consequently, the broadest reading of misappropriating advertising ideas is that the insured wrongfully took an idea about the solicitation of business. But the *Lynchval* complaint contends no such thing. The only ideas Winklevoss is accused of stealing are mathematical formulas and raw data input questions from Lynchval's software. These are not ideas about getting more business, or how to promote a product, or even how to approach customers. These are ideas about how develop a computer program that can determine the cost of employee benefit programs. Even under the most liberal interpretation of the complaint, it does not claim the "wrongful taking of the manner or means by which [Lynchval] advertises its goods or services." *Lebas,* 50 Cal.App.4th at 562, 59 Cal.Rptr.2d at 44.

■ To squeeze these allegations into the "misappropriation of advertising ideas" aperture would be to transgress the parties' reasonable expectations. Indeed, such an interpretation would read the last two words right out of the phrase, condoning coverage for

any wrongful taking, just because the claim happens to use the "misappropriation" nomenclature. We conclude that taking a trade secret is not equivalent to taking an advertising idea unless the secret has do to with how something is advertised.

Winklevoss fares no better with the "misappropriation of a style of doing business" offense. The courts interpreting this phrase have consistently held it to refer to "a company's comprehensive style of doing business," *St. Paul Fire & Marine Ins. Co. v. Advanced Interventional Sys., Inc.,* 824 F.Supp. 583, 585 (E.D.Va.1993) (citing cases), *aff'd,* 21 F.3d 424, 1994 WL 118029 (4th Cir.1994); *Atlantic Mut. Ins. Co.,* 191 Wis.2d 229, 239–40, 528 N.W.2d 486 (1995), or the "outward appearance or signature of a business," *Owens–Brockway Glass Container, Inc. v. International Ins. Co.,* 884 F.Supp. 363, 369 (E.D.Cal.1995), *aff'd,* 94 F.3d 652, 1996 WL 445082 (9th Cir.1996). The *Lynchval* complaint, however, is concerned with the theft of its products' inner workings, not their outward appearance. Unlike a trademark, a trade secret's basic function is not advertisement. *See Lebas,* 50 Cal.App.4th at 562, 59 Cal.Rptr.2d at 44. Moreover, the *Lynchval* suit claims that Winklevoss misappropriated only trade secrets from two software programs, not the overall scheme by which Lynchval conducts its business. *See St. Paul,* 824 F.Supp. at 585 (stealing a single product is not misappropriating a style of doing business). The caselaw therefore does not permit a finding that Winklevoss stole Lynchval's style of doing business by stealing its trade secrets.

Because the *Lynchval* allegations fall far short of even the most liberal definitions of "misappropriation of advertising ideas or style of doing business," Winklevoss cannot satisfy the third covered offense under Federal's insurance policy. We now consider whether Winklevoss can show that it allegedly committed one of the remaining enumerated offenses.

### III. The Lynchval Allegations Do Not Constitute Disparagement, Infringement of Title, or an Invasion of Privacy

■ Winklevoss argues for the first time in its combined response/reply brief that the *Lynchval* complaint contains facts that fit within the rest of the covered offenses: "oral or written publication of material that ... disparages a person's or organization's goods, products or services"; "infringement of title"; and "oral or written publication of material that violates a person's right of privacy." This position has no merit. Finding that the *Lynchval* complaint alleges these covered offenses would require this Court to rewrite the complaint.

Winklevoss begins its disparagement argument by conceding that "the *Lynchval* complaint states no express claim for disparagement...." Pls.' Reply at 14. Nonetheless, it asserts that the following allegations trigger a duty to defend under this covered offense:

> 86. Upon information and belief, CCA and Winklevoss have approached other companies, with whom Lynchval Systems has a contractual relationship, and has offered to license or lease to them, Proval software which was improperly developed with reference, by CCA and Winklevoss, to trade secret information of Lynchval Systems.

> 87. Such approaches have resulted in at least one contractual client of Lynchval Systems canceling its contract and beginning use of CCA's illicitly developed software, Proval.

Winklevoss contends that because it allegedly promoted Proval to Lynchval's customers, and one customer canceled its contract with Lynchval as a result, that we must read into these words that Winklevoss disparaged Lynchval's product during its advertising pitch. We decline the invitation to distort the allegations in this manner.

According to Black's Law Dictionary, disparagement is "[a] statement about a competitor's goods which is untrue or misleading and is made to influence or tends to influence the public not to buy." *Black's Law Dictionary* (6th ed.1990); *see also DecisionOne Corp. v. ITT Hartford Ins. Group,* 942 F.Supp. 1038, 1043 (E.D.Pa.1996) (citing *Black's* definition). There is nothing in the complaint to suggest that Winklevoss said

anything at all about Lynchval—let alone anything negative and misleading—or did anything other than promote its own product. Lynchval's customer could well have canceled its contract with Lynchval based on its own opinion of the competing software products' relative merits. To assume that Winklevoss made misleading and derogatory comments about Lynchval would be to create nonexisting allegations, violating our duty to compare the complaint's express allegations to the insurance policy. If Lynchval wanted to allege that Winklevoss mislead the public with negative statements about Lynchval's products, it would have been easy enough to do so. Lynchval included just such allegations in its Second Amended Substitute Complaint.

■ Next, Winklevoss presses two points to support its position that the *Lynchval* complaint claims infringement of title: (1) the complaint alleges that Winklevoss emulated Lynchval's software; and (2) the name "Proval" is so similar to "Lynchval" that Lynchval must have complained about it somewhere in the complaint. Both are infirm. The first point fails because there is no legal or factual basis for concluding that software emulation is an infringement of title. The second lacks any grounding in the complaint's allegations.

"Title" is defined in Black's Law Dictionary as "[a] mark, style, or designation; a distinctive appellation; the name by which anything is known." *Black's Law Dictionary* (6th ed.1990). Webster's defines it as "an inscription placed over, upon, or under something to describe, distinguish, explain, or entitle it … a descriptive name: a distinctive appellation or designation." *Webster's Third New International Dictionary* 2400 (1981); *see First State Ins. Co. v. Alpha Delta Phi Fraternity*, 39 U.S.P.Q.2d 1905, 1913 (1995). The allegation that Winklevoss emulated Lynchval's software cannot conceivably fall within these definitions:

> 66. Upon information and belief, CCA has provided Winklevoss with either the results of the runs through the Lynchval software, or with information learned through comparison runs, so as to permit Winklevoss to make changes and modifica-

tions to its software, to more closely emulate the Lynchval software.

This paragraph makes clear that Winklevoss was allegedly emulating the way the Lynchval software functioned, as explained in other paragraphs, by stealing secret formulas and proprietary data entry questions—not by imitating how the software appeared physically. Nowhere does the complaint allege that Winklevoss emulated a distinctive mark describing the software or a name by which the software was known to the public. Winklevoss' contention that the complaint takes issue with the similarity between the Proval and Lynchval names, thereby alleging infringement of title, would be persuasive if it were true. But just as with disparagement, there are no allegations complaining about Winklevoss' use of the name "Proval." The paragraphs that Winklevoss claims "clearly seek potentially to impose liability on Winklevoss for use of the Proval" name simply do not do so.

■ Finally, Winklevoss maintains that its alleged trade secret misappropriation supports recovery under the "invasion of privacy" offense. Not one case has ever held that trade secret misappropriation falls within the covered offense "oral or written publication of material that violates a person's right of privacy"—Winklevoss cites none and our research revealed none. More importantly, Winklevoss points to nothing in the complaint that could be construed as alleging that Winklevoss violated Lynchval's privacy rights when it misappropriated Lynchval's trade secrets. That is because no such allegations exist.

In short, Winklevoss has not succeeded in demonstrating that the *Lynchval* complaint contains allegations fitting any of the policy's enumerated offenses.

### CONCLUSION

Because Winklevoss has failed to meet the second and third components of advertising injury, Federal had no duty to defend the original *Lynchval* complaint under its policies' provisions for advertising injury (Count I). And since Federal had no defense obligations, it did not breach the insurance contract by refusing Winklevoss' request to defend the action (Count II). *See Indiana Ins. Co. v. Hydra Corp.*, 245 Ill.App.3d 926, 185

Ill.Dec. 775, 615 N.E.2d 70, 75 (1993). Finally, given that the duty to defend is far broader than the duty to indemnify, *see Hurst–Rosche Eng'rs. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995), we must conclude that Federal has no obligation to indemnify Winklevoss under the policies' advertising injury provisions, *see Houston Gen. Ins. Corp. v. BSM Corp.,* 843 F.Supp. 1264, 1266 (N.D.Ill.1994) ("[T]here can be no duty to indemnify when no duty to defend exists.... Therefore, Illinois law allows this court to grant summary judgment declaring that the plaintiff-insurer has neither a duty to defend nor a duty to indemnify the defendant-insured."). We therefore grant Federal's motion for summary judgment, and deny Winklevoss' motion for summary judgment.

It remains to be determined whether Federal has a duty to defend or indemnify Winklevoss under Lynchval's Second Amended Substitute Complaint. Although we must strongly express our concern about this type of piecemeal litigation, we will honor Winklevoss' request to leave that issue for another day because this problem was caused by Federal's ill-timed counterclaim. However, the parties should carefully evaluate this opinion before engaging in prolonged litigation with respect to Lynchval's Second Amended Complaint. A status hearing will be held on February 4, 1998 at 9:00 a.m. to set a fair and efficient schedule to bring this lawsuit to a conclusion.