**ARNETTE OPTIC ILLUSIONS, INC., and Gregory Arnette, Plaintiffs,**

v.

**ITT HARTFORD GROUP, INC. and Hartford Insurance Company of the Midwest, Defendants.**

**And Related Counterclaims**

**No. CV 98–1740 CM MANX.**

United States District Court, C.D. California.

July 24, 1998.

Order Denying Reconsideration Feb. 16, 1999.

David Hinshaw and T.A. Taurino, Gansinger & Hinshaw, L.L.P, Los Angeles, CA, for Plaintiffs.

Stephen J. Erigero, Ropers, Majeski, Kohn & Bentley, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION (RE POUILLOUX); AND GRANTING DEFENDANT'S MOTION FOR SUMMARY ADJUDICATION (RE OAKLEY)

MORENO, District Judge.

The Court, having considered all papers and admissible evidence filed in connection with Plaintiffs' Motion for Summary Adjudication, Defendant's Motion for Summary Adjudication (Re Pouilloux Action), and Defendant's Motion for Summary Adjudication (Re Oakley Action), and after hearing oral argument on these motions, hereby **grants in part and denies in part** Plaintiffs' motion, **denies** Defendant's motion (re Pouilloux action) and **grants** Defendant's motion (re Oakley action).

## I.

### FACTUAL BACKGROUND

Plaintiffs are Arnette Optic Illusions, Inc. ("Arnette"), a California corporation that manufactures sunglasses, and Gregory Arnette ("Mr.Arnette"), president and director of Arnette. Defendant is Hart-

ford Insurance Company of the Midwest (also named erroneously in Complaint as ITT Hartford Group, Inc.) ("Hartford"), which contracted with Arnette for a "Special Multi–Flex" insurance policy (the "policy"), including commercial general liability ("CGL") insurance coverage, effective April 10, 1992 through April 9, 1996.

The policy covered "advertising injury," which includes "misappropriation of ... style of doing business." Under the policy, Hartford had the duty to defend any suit seeking damages related to an advertising injury. The instant action relates to the applicability of the policy to two underlying suits brought against Arnette: the "Pouilloux" action and the "Oakley" action.

### A. The Pouilloux Action

On September 14, 1995, Sporoptic Pouilloux, S.A. ("Pouilloux") served a counterclaim on Arnette in an action captioned, *Arnet Optic Illusions, Inc. v. Sporoptic Pouilloux, S.A.,* SA CV 94–265 LHM (C.D.Cal.) (the "Pouilloux" Action). In that counterclaim, Pouilloux asserted federal and state claims for trademark infringement, unfair competition, trademark dilution and injury to business reputation. Among other things, Pouilloux alleged: (1) Arnette infringed upon Pouilloux's "Vuarnet" trademark,[1] (2) Arnette misappropriated Pouilloux's goodwill and business reputation; and (3) Arnette's use of the names "Arnet" and "Arnet Optic Illusions" on eyewear and eyewear accessories constituted trademark infringement and was an attempt to misappropriate the fame and goodwill associated with the Vuarnet marks.

In or around October 1995, Arnette claims it tendered the Pouilloux action to Hartford for indemnity and a defense. Craig Lark, who was then chief operating officer of Arnette, has testified that he contacted by telephone Richard W. Jordan, the insurance broker through whom

---

**1.** Pouilloux manufactures and sells sunglasses and eyewear accessories under federal trade- marks including the "Vuarnet" mark.

Arnette had purchased the claim. According to Messrs. Lark and Jordan, a Hartford representative, Steve Amos, also participated in the conversation. After Mr. Lark explained the details of the Pouilloux action, Mr. Amos allegedly stated that the policy did not provide coverage for the claims made against Arnette in the Pouilloux action. Hartford asserts that it has no record of this alleged tender of the matter by Arnette.

On May 23, 1996, Arnette formally tendered the Pouilloux action to Hartford in writing. On July 30, 1996, Hartford informed Arnette that it was denying coverage for the Pouilloux action on the grounds that "trademark infringement" and "unfair competition" are not covered offenses under the policy's definition of "advertising injury." In addition, the letter states, "The pleadings allege that our insured began using the Arnet symbol/name in *1991*," prior to the inception of Arnette's policy on April 10, 1992. (Emphasis in original).

On September 17, 1996, Arnette wrote to Hartford requesting reconsideration of the tender. In that letter, Arnette noted the California Court of Appeal's holding in *Lebas Fashion Imports v. ITT Hartford,* 44 Cal.App.4th 531, 52 Cal.Rptr.2d 26 (1996), that trademark infringement is covered as an advertising injury. Also, Arnette pointed out that Pouilloux's counterclaim states, "[U]pon information and belief, Arnet Optical Illusions and Arnette commenced using ARNET and/or ARNET OPTIC ILLUSIONS as trademarks and/or trade names *no earlier than 1991.*" (Emphasis added). Hartford responded on October 7, 1996, reaffirming its denial of the tender.

On October 22, 1996, Arnette responded with a letter that asserted, among other things, that Arnette "did not start selling, shipping, or advertising until 1992." On October 29, 1996, the California Court of Appeal published its opinion following the rehearing of *Lebas* and maintained its conclusion that trademark infringement is

covered under policies that reach advertising injury.

On November 13, 1996, Hartford agreed, under a complete reservation of rights, to defend Arnette in the Pouilloux action. Hartford asserts that its change of heart was based on Arnette's representation in the October 22 letter that it did not begin manufacturing, selling or advertising its goods until 1992. Hartford has paid $94,970.12 in fees and costs that accrued relating to the defense of the Pouilloux action since Arnette's May 23, 1996, written tender.

Meanwhile, on July 22, 1996, Arnette settled Pouilloux's counterclaims for $850,000. In addition, Arnette agreed to destroy more than $5 million worth of its inventory[2] and agreed not to use either of the allegedly infringing trademarks. The settlement did not involve any admission of fault on the part of Arnette.

### B. *The Oakley Action*

In the early 1990s, Mr. Arnette was employed by Oakley, Inc., a manufacturer of sunglasses, eyewear and related accessories, as a sports marketing manager. In late 1991, Mr. Arnette left Oakley to start his own business in the sunglass and eyewear market. On March 30, 1992, Oakley sued both Arnette and Mr. Arnette in state court, alleging misappropriation of trade secrets. The action was settled on June 21, 1993.

On September 21, 1994, Oakley, Inc. filed a second action in the Superior Court of the State of California, County of Orange, captioned *Oakley, Inc. v. Arnet Optic Illusions, Inc., et al.,* Case No. 736079 (the "Oakley action"). The complaint stated causes of action for breach of contract, misappropriation of trade secrets and declaratory relief.

The gravamen of Oakley's cause of action for misappropriation is that Arnette's manufacture and marketing of the "Steel

---

**2.** According to Hartford, the inventory was worth approximately $5.75 million. According to Arnette, it was worth more than $7 million.

Raven" sunglasses involved the use of trade secret information Mr. Arnette obtained while working at Oakley. According to the complaint, the misappropriation began within 90 days of the filing of the lawsuit.

Arnette tendered the Oakley action to Hartford on May 23, 1996, at the same time it tendered the Pouilloux action in writing. On July 30, 1996, Hartford denied a defense to Arnette, stating that the Oakley action was not covered. Hartford's reasoning was that the suit was based on the 1992 action Oakley had filed against Arnette, which had been settled prior to the inception of the policy. In addition, Hartford asserted that misappropriation of trade secrets is not covered as an offense under the advertising injury portion of the policy. Finally, Hartford noted that the action was tendered nearly two years after Oakley filed suit.

On October 7, 1996, Hartford reaffirmed its denial of coverage. Hartford stated that its decision was based on a limitation in the policy which excludes coverage for offenses which first occurred prior to the policy period. Hartford emphasized that the Oakley action was based on the earlier action, which had been filed prior to the April 10, 1992, inception of the policy. In April 1997, Arnette settled the Oakley action for $750,000.

## II.

### DISCUSSION

#### A. *Summary Judgment Standard*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In a trilogy of 1986 cases, the Supreme Court clarified the applicable standards for summary judgment. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industry Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome, it is material. *Id.* at 248, 106 S.Ct. 2505. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative, admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence submitted by the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548.

If the moving party meets its initial burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In assessing whether the non-moving party has raised a genuine issue, its evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient to create a genuine issue of material fact. *Id.* at 252, 106 S.Ct. 2505. As the Supreme Court explained in *Matsushita,*

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

*Id.*, 475 U.S. at 586–87, 106 S.Ct. 1348.

■ To be admissible for purposes of summary judgment, declarations or affidavits must be based on personal knowledge, must set forth "such facts as would be admissible in evidence," and must show that the declarant or affiant is competent to testify concerning the facts at issue. Fed.R.Civ.P. 56(e). Declarations on information and belief are insufficient to establish a factual dispute for purposes of summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

Summary judgment is not treated as "a disfavored procedural shortcut" but as "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## B. *The Pouilloux Action*

### 1. Duty to Defend

■ The first issue in determining the rights and responsibilities of the parties with respect to the Pouilloux action is whether or not Hartford breached its duty to defend Arnette.[3] Under California law, it is well-settled that a liability insurer owes its insured a broad duty to defend against claims that create a potential for indemnity. *See Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076, 1081, 17 Cal. Rptr.2d 210, 846 P.2d 792 (1993); *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 276, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). The duty to defend is broader than the duty to indemnify. *Horace Mann*, 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792. The "bare 'potential' or 'possibility' of cov-

erage ... [is] the trigger of a defense duty." *Montrose Chem. Corp. v. Superior Court*, 6 Cal.4th 287, 300, 861 P.2d 1153, 24 Cal.Rptr.2d 467 (1993).

"To prevail, the insured must prove the existence of a *potential for coverage*, while the insurer must establish the *absence of any such potential*. In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (emphasis in original).

■ An insurer has no duty to defend where the claim falls within an exclusion to the policy. *See Legarra v. Federated Mutual Ins. Co.*, 35 Cal.App.4th 1472, 1482–83, 42 Cal.Rptr.2d 101 (1995). Nevertheless, "[a]ny doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor." *Horace Mann*, 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792. In addition, the duty to defend is continuing: it arises on tender of defense and continues until the underlying lawsuit concludes or "until it has been shown that there is *no* potential for coverage." *Montrose*, 6 Cal.4th at 295, 24 Cal. Rptr.2d 467, 861 P.2d 1153 (emphasis in original).

■ The determination of whether the duty to defend attaches is made initially by comparing the allegations of the complaint with the terms of the policy. *Horace Mann*, 4 Cal.4th at 1081, 17 Cal. Rptr.2d 210, 846 P.2d 792. The duty is analyzed based upon those facts available to the insurer at the time of the tender of defense. *See Aetna Casualty & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346, 350 (9th Cir.1988); *CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App.3d 598, 605, 222 Cal.Rptr. 276 (1986).

---

**3.** Hartford argues that this part of Arnette's motion is moot because Hartford has agreed to defend Arnette in the Pouilloux action and has paid the defense costs incurred after May 23, 1996, under a reservation of rights. In Hartford's cross-motion for summary adjudi-

cation (Re Pouilloux), however, it seeks reimbursement of ·the defense costs it has paid. As such, the Court must consider whether or not Hartford had a duty to defend Arnette in the Pouilloux action.

Hartford offers three primary arguments why it had no duty to defend Arnette in the Pouilloux action: (a) trademark infringement is not a covered "advertising injury" offense; (b) the claim is not covered because it falls within the "first publication" exclusion; and (c) no advertising injury offense occurred during the policy period. Each of these arguments is discussed below.

a. *Trademark infringement is covered as an "advertising injury."*

The policy covers " '[a]dvertising injury' caused by an offense committed in the course of advertising your goods, products or services." Advertising injury is defined to include "[m]isappropriation of advertising ideas or style of doing business."

In its denial letter of July 30, 1996, Hartford stated that it would not defend Arnette because the claims asserted against it by Pouilloux—trademark infringement and unfair competition—"are not 'enumerated offenses' listed under the definition of 'advertising injury.' " Accordingly, Hartford determined that the Pouilloux action was not covered under the policy.

█ In light of clear California caselaw to the contrary, Hartford's argument on this issue requires but brief discussion.[4] In *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group,* 44 Cal.App.4th 531, 52 Cal.Rptr.2d 26 (1996) ("*Lebas I* "), the California Court of Appeal analyzed the same issue under an identical provision in a Hartford CGL policy and found in favor of the insured. *Lebas I,* which was decided on April 11, 1996, held that "the 'advertising injury' coverage provided under Hartford's CGL policy does extend to a claim for trademark infringement." 52 Cal.Rptr.2d at 28. On May 13, 1996, the Court of Appeal granted a rehearing in the *Lebas* case. On October 29, 1996, it issued a revised opinion, *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group,*

50 Cal.App.4th 548, 59 Cal.Rptr.2d 36 (1996) ("*Lebas II* "), which reaffirmed the holding of *Lebas I. Lebas II* remains good law in California and it is clear, therefore, that a CGL policy defining advertising injury to include "misappropriation of advertising ideas or style of doing business" covers trademark infringement claims. *See Lebas II,* 50 Cal.App.4th at 553, 59 Cal.Rptr.2d 36. *See also Dogloo, Inc. v. Northern Ins. Co. of New York,* 907 F.Supp. 1383, 1390 (C.D.Cal.1995) (finding claim against insured for trade dress infringement potentially covered under policy as advertising injury; holding insurer owed duty to defend).

Hartford offers three arguments against this conclusion. First, Hartford argues that the Court should follow *Owens–Brockway Glass Container,* 884 F.Supp. 363, 368 (E.D.Cal.1995), and *St. Paul Fire & Marine v. Advanced Interventional,* 824 F.Supp. 583, 585 (E.D.Va.1993). These cases, however, discuss patent infringement rather than trademark infringement and therefore are not controlling.

Second, Hartford argues that *Lebas II* was "decided incorrectly" and that the California Supreme Court "will rule otherwise once directly confronted with the issue." While that may be, unless and until *Lebas II* is overruled, the Court finds it unnecessary to consider Hartford's indulgent speculation.

█ Finally, Hartford argues that during most of the relevant time—from Arnette's May 23, 1996 tender until November 13, 1996, when Hartford agreed to defend under a reservation of rights—the Court of Appeal had granted rehearing and therefore the *Lebas I* decision was a legal nullity. This argument has two weaknesses. First, the *Lebas I* decision was not explicitly decertified or depublished, thus the most that can be said in support of Hartford's position is that the

---

4. Hartford advanced the argument that trademark infringement is not an advertising injury in both its opposition to Arnette's motion for summary adjudication and in its cross-

motion for summary adjudication (re Pouilloux action). Tellingly, however, it abandoned the argument in its reply brief (re Pouilloux action).

law was subject to change during that period. Second, even if the law was uncertain at the time of the denial, this does not relieve Hartford of its duty to defend. At the very least, the *Lebas I* decision established an ambiguity regarding coverage. Given the rule that the insurer must defend its insured whenever it ascertains a potential for liability under the applicable policy, Hartford should have provided a defense (under a reservation of rights) even after rehearing was granted in *Lebas I. See Gray,* 65 Cal.2d at 276–77, 54 Cal. Rptr. 104, 419 P.2d 168.

### b. The "first publication" exclusion does not apply here.

Hartford argues that the Pouilloux action is not covered because Arnette first advertised and promoted goods with the allegedly infringing trademark prior to the April 10, 1992 inception of the policy.[5] Hartford relies on the "first publication" exclusion under the policy to deny coverage. Arnette argues that the first publication exclusion does not apply to trademark infringement claims.[6]

The policy excludes coverage for advertising injury "Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period." In addition, the policy defines "advertising injury" as injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

Courts are split regarding whether the first publication exclusion applies to all advertising injuries or only to libel, slander and invasion of privacy. In *Irons Home Builders Inc. v. Auto–Owners Ins. Co.,* 839 F.Supp. 1260, 1265 (E.D.Mich.1993), the court found that the exclusion applied only to advertising injury resulting from slander, libel or invasion of privacy. The Court found that the insurer owed a duty to defend the insured against allegations of copyright infringement, even though the first alleged act of infringement occurred prior to the policy period. The court explained,

The exclusion provision refers to the "oral or written publication of material." It mimics the provisions of the policy that relate to advertising injury involving libel, slander, and invasion of privacy. In each case, advertising injury is defined as the "oral or written publication of material" that is slanderous or libelous or invades privacy.... Given the duplicative language of the provision, it is a reasonable construction of the provisions that it only applies to libel, slander and invasion of privacy ....

*Irons Home,* 839 F.Supp. at 1264–65. *See also Jerry Madison Enterprises, Inc. v. Grasant Manuf. Co., Inc.,* 1990 WL 13290 (S.D.N.Y. Feb.14, 1990) (finding exclusion applicable only to libel, slander or invasion of privacy).

Hartford argues that "[t]he 'first publication' exclusion has been declared clear and unambiguous." While this overstates the case law, at least one court has found that the first publication exclusion applies to all types of advertising injury, not just libel slander and invasion of privacy. In

---

**5.** Hartford points to advertisements that were published in the first months of 1992 and Arnette's Answer to Pouilloux's counterclaim as evidence that Arnette began using the allegedly infringing trademarks in 1991.

**6.** In the alternative, Arnette argues that even if the first publication exclusion does apply, it is irrelevant because the duty to defend arises at the time of tender and Hartford did not conduct any investigation or determine any facts at that time that would support the application of the exclusion.

*Applied Bolting Technology Products, Inc. v. United States Fidelity & Guaranty Co.,* 942 F.Supp. 1029, 1037 (E.D.Pa.1996), the court expressly disagreed with the *Irons Home* court and found that the plain meaning of the term "advertising injury" in the policy applies to the entire definition. Thus, the court found that the first publication exclusion extended to all four subparts of "advertising injury" as defined in the policy, not just the two subparts that mimic the language of the exclusion. *Id.*

 Arnette argues that at the very least, the lack of a controlling in-circuit authority indicates that the policy language is ambiguous. "An insurance policy is ambiguous when it is capable of two or more constructions, both of which are reasonable." *Bay Cities Paving & Grading, Inc. v. Lawyer's Mut. Ins. Co.,* 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993). If a policy provision is ambiguous, it must be construed to protect the reasonable expectations of the insured. *See Bank of the West v. Superior Court,* 2 Cal.4th 1254, 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). If this rule does not resolve the ambiguity, the policy provision must be construed against the insurer and in favor of coverage. *See id.* Accordingly, Arnette argues that it should be given the benefit of any doubt as to the scope of the first publication exclusion.

Arnette has the better argument here, especially in light of the breadth of the duty to defend. *See, e.g., CNA Casualty of California v. Seaboard Surety Co.,* 176 Cal.App.3d 598, 606, 222 Cal.Rptr. 276 (1986) ("the duty to defend is so broad that as long as the complaint contains language creating the potential of liability under an insurance policy, the insurer must defend an action against its insured . . ."); *Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co.,* 76 Cal.App.3d 272, 278, 142 Cal.Rptr. 681 (1977) ("Where there is doubt as to whether the duty to defend exists, the doubt should be resolved in favor of the insured and against the insurer").

Even under the more exacting standard of the duty to indemnify, because both Hartford's and Arnette's interpretations of the policy language are reasonable, and because the case law supports both interpretations, the Court finds that the language in question is ambiguous and must be interpreted in favor of Arnette's reasonable expectation of coverage.

### c. *Relevant conduct occurred within the policy period.*

 Hartford argues that it had no duty to defend Arnette because no advertising injury offenses alleged in the Pouilloux action occurred during the policy period. Hartford argues that any alleged advertising injury "would have pre-dated the effective date of the HARTFORD policy. According to the allegations set forth in Pouilloux's lawsuit, ARNET's alleged injurious conduct began soon after October of 1991, after GREG ARNETTE left Oakley and when he established his own business to manufacture, market and sell sunglasses and related products." (Emphasis in original.) Hartford's argument, however, misstates the relevant pleading. In its counterclaim, Pouilloux asserted that the use of the allegedly infringing trademarks began *"no earlier than* 1991." (Emphasis added.)

In addition, Hartford relies on statements Arnette made in answering the Pouilloux counterclaim. For example, in its Answer, Arnette admitted that it "commenced using Arnet and Arnet Optic Illusions as trademarks and trade names since 1991 and have used the same in relation to optical goods such as eyeglasses and sunglasses, eyewear accessories and related goods." For the purposes of the duty to defend, however, this statement is immaterial because there is no evidence that Hartford had these documents or relied on them when making its decision to deny a defense.

The duty to defend must be determined based on the facts known to the insurer at the time of the tender. In *CNA Casualty,* for example, the insurer argued that a first

publication exclusion precluded coverage given that the policy became effective in 1969 and the complaint alleged that the insured's tortious activities began "at a time unknown to plaintiffs but at least as early as 1966." 176 Cal.App.3d at 614, 222 Cal.Rptr. 276. The court held that because it was unclear whether the insured had committed the tortious act prior to the 1969 effective date, the insurer was required to provide a defense. *Id.* The court noted that the "spirit" of *Gray v. Zurich Ins. Co.* "would not be served if an insurer could decline a defense where the application of an exclusion was only a possibility." *Id.*

At the time of Arnette's tender of the defense to Hartford, it is clear that at least a *potential* for coverage existed: The *possibility* existed that the complained of activity (the use of the "Arnet" mark on products so as to constitute trademark infringement or passing off of goods) occurred after the inception of the policy. Moreover, even if the statements contained in Arnette's answer to the counterclaim are considered, they do not prove whether Arnette committed any of the conduct complained of in the Pouilloux action during the policy period. Therefore, Hartford has not provided evidence to support its conclusion that "no advertising injury offense . . . occurred during the policy period."

■■■■ Based on the facts available to Hartford at the time of tender, at least the *potential* for coverage existed under the policy. Moreover, Hartford had *no proof* that any exclusion applied or that the facts underlying the Pouilloux action were outside the scope of the policy.[7]

---

7. The only remaining issue with respect to the duty to defend the Pouilloux action, then, is when the duty attached. Under California law, the duty attaches when an insured tenders a claim showing a potential for coverage to the insurer. Arnette argues that it orally tendered the Pouilloux claim for defense in October 1995 but the tender was rejected by Hartford agent Steve Amos. Hartford has no record of any such tender.

### 2. Reimbursement of Defense Costs

■■■■ Under California law, the insurer has no right to seek reimbursement from the insured for defense costs relating to claims that are at least *potentially* covered under the policy at issue. *See Buss v. Superior Court,* 16 Cal.4th 35, 49, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997). The insurer may, however, seek reimbursement for defense costs that are allocable "solely" to claims that are not even potentially covered. *Id.* at 49, 52, 65 Cal.Rptr.2d 366, 939 P.2d 766. The insurer bears the burden of proving by a preponderance of the evidence that all or part of its costs were allocable solely to claims that had no potential for coverage. *Id.* at 53, 65 Cal. Rptr.2d 366, 939 P.2d 766.

Here, Hartford's argument that it is entitled to reimbursement rests on the theory that it had no duty to defend Arnette from the Pouilloux counterclaim since none of the conduct alleged by Pouilloux was potentially covered under the policy. Based on the ambiguity of the relevant policy provisions and Hartford's lack of evidence to support a denial of defense at the time of tender, Hartford cannot meet its burden here.

### 3. Bad Faith Breach of Duty to Defend

■■■■ Under California law, all contracts contain an implied covenant of good faith and fair dealing. *See San Jose Prod. Credit Assn. v. Old Republic Life Ins. Co.,* 723 F.2d 700, 703 (9th Cir.1984). The covenant requires each party to refrain from doing anything to injure the right of the other to receive the benefits of the contract. *Id.* Breach of an insurer's duty

---

Arnette's argument based on the purported oral tender is not persuasive because the policy requires the insured to provide *written* notice of the claim or any suit brought against it. It is undisputed that Arnette first provided written notice in May 1996. Thus, the duty to defend attached at that time.

to defend violates a contractual obligation; without more, it does not amount to a tortious breach of the covenant of good faith and fair dealing. *Id.* at 703–04.

 Where the insurer's failure to defend is unreasonable, however, it violates the covenant of good faith and fair dealing. *Amato v. Mercury Cas. Co.,* 53 Cal.App.4th 825, 831, 61 Cal.Rptr.2d 909 (1997). An unreasonable failure to defend occurs where an insurer has no good cause to support its refusal to defend. *Id.* The issue of reasonableness is ordinarily a question of fact for the jury. *West v. State Farm Fire & Cas. Co.,* 868 F.2d 348, 350 (9th Cir.1989). When the undisputed facts leave no room for a reasonable difference of opinion, however, it loses its triable character and becomes a question of law. *Id.*

Hartford argues that its initial refusal to defend Arnette in the Pouilloux matter was, at most, a breach of the contractual duty to defend. Hartford argues that its denial of the defense was supported by its reasonable interpretation of the policy and the applicable law and facts. Hartford notes that once Arnette represented that it had not committed any allegedly infringing activity until 1992, it paid Arnette's defense costs.

 Arnette argues that Hartford breached its duty of good faith and fair dealing in refusing to defend Arnette without proper cause. Arnette supports its argument with numerous internal memoranda contained in Hartford's claims files.

In its first letter declining coverage, dated July 30, 1996, Hartford stated that its decision was based on the following factors: (1) the pleadings indicate that Arnette began using the infringing symbol in 1991, which would preclude coverage under the first publication exclusion; and (2) unfair competition and trademark infringement are not "enumerated offenses" under the policy. In an October 7, 1996 letter reaffirming its denial of coverage, Hartford emphasizing that the infringing activity occurred prior to the policy period and noting that the *Lebas I* decision was being reheard.

The information contained in Hartford's claims files shows that its reasons for denying a defense were severely flawed and arguably unreasonable. First, as late as October 28, 1996—more than five months after Arnette tendered the defense and more than three months after Arnette settled the case—Hartford admitted it did not have any facts to prove that the alleged infringing conduct occurred outside the policy period.[8] Second, even if the infringing activity did begin before the inception of the policy, Hartford's own agent admitted that the first publication exclusion was ambiguous and could be read to apply solely to libel, slander and invasion of privacy.[9] Finally, the *Lebas I* decision had already found that trademark infringement is covered as an advertising injury under the Hartford CGL policy. Hartford was apparently playing a waiting game in the hopes that the Court of Appeal would change its position on rehearing. Refusing to pay defense costs until after the

---

8. In an October 28, 1996 memorandum from Hartford claims representative Bill Simanski to Hartford claim service consultant Cosmo Borzillo, Mr. Simanski admitted, "In my 9/24/96 I said that there was a potential for coverage but for the fact that the insured's acts preceded the inception of our policy. *It may still be the case but we have no proof* and the insured's attorney claims the insured didn't, '... start selling, shipping or advertising intil [sic] 1992.'. There is thus a potential that the offense of misappropriation of style of doing business did first begin in our policy period." (Emphasis added).

9. In a September 24, 1996 memorandum from Mr. Simanski to Hartford manager Paula Beland, Mr. Simanski argued that a defense could be denied based on a particular reading of the first publication exclusion: "Now comes a subtle coverage distinction. Is the exclusion for, '... publication of material whose first publication took place before the beginning of the policy period;' referring only to the enumerated offenses of libel or slander? I argue that it doesn't."

court reheard and reaffirmed that decision may also be seen as evidence of bad faith.

Given the documentation in Hartford's file, at least some Hartford agents recognized a potential for coverage based on the Pouilloux claim. Based on these internal memoranda, Arnette has a strong argument that Hartford's failure to defend the Pouilloux action in the initial months following the May 1996 tender constitutes a breach of the duty of good faith and fair dealing. Nevertheless, the Court recognizes that the controlling caselaw was at least arguably in flux at the time and that Hartford *did* ultimately decide to defend Arnette, agreeing on November 13, 1996, to pay the defense costs under a reservation of rights. Accordingly, the Court finds that the issue of whether Hartford's breached of the duty to defend constituted bad faith is inappropriate for resolution by way of summary judgment—the issue presents questions of fact on which reasonable jurors could disagree.

### 4. Duty to Indemnify

In its cross-motion for summary adjudication, Hartford asks the Court to find that it had no duty to indemnify Arnette. Because the Court has found that the first publication exclusion does not preclude coverage in this case, Hartford owes Arnette a duty to indemnify it for liability stemming from the alleged trademark infringement. The amount of liability or damages, however, is not appropriate for summary judgment because it is a function, at least in part, of the nature of the damages incurred. Given that the Arnette–Pouilloux settlement involved no admission of wrongdoing, and given that the parties have not offered any evidence regarding the nature of damages, the Court is not able at this time to render a decision regarding the amount of indemnity Hartford owes Arnette.

---

**10.** Arnette concedes that the breach of contract claim is not covered under the policy.

### C. *The Oakley Action*

#### 1. Misappropriation of Trade Secrets Is Not Covered as an Advertising Injury.

As with the Pouilloux action, Hartford argues that because there was no potential for coverage, it had no duty to defend Arnette in the Oakley action. Hartford offers two primary arguments in support of its denial of a defense: (a) misappropriation of trade secrets is not covered as an "advertising injury" under the policy;[10] and (b) even if the policy does cover misappropriation of trade secrets, the first publication exclusion precludes coverage in this case because Arnette advertised the goods in question prior to the inception of the policy.

The primary issue in determining whether Hartford breached its duty to defend the Oakley action is whether misappropriation of trade secrets is covered as an "advertising injury" under the policy. According to the California Supreme Court, " 'advertising injury' must have a causal connection with the insured's 'advertising activities' before there can be coverage." *Bank of the West*, 2 Cal.4th at 1277, 10 Cal.Rptr.2d 538, 833 P.2d 545. Under the policy, Hartford provides coverage for advertising injury only if it was "caused by an offense committed [by Arnette] in the course of advertising [its] goods, products or services."

In two recent cases, the Ninth Circuit has clarified the circumstances under which a claim for misappropriation of trade secrets provides a potential for coverage under an advertising injury provision. *See Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219, 1222 (9th Cir.1996); *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.*, 93 F.3d 578 (9th Cir.1996).

In *Simply Fresh*, the insureds brought an action against their insurer for failing to defend them against allegations of mis-

---

Accordingly, coverage is disputed only as to the misappropriation of trade secrets claim.

appropriation of trade secrets and patent infringement. The gravamen of the underlying action alleged that the insured had misappropriated a secret automated production line system for slicing fruit. 94 F.3d at 1220. The Circuit affirmed the district court's holding that because the allegations in the trade secret action did not arise in the course of Simply Fresh's advertising activities, the trade secret claims were not potentially covered as advertising injury offenses. *Id.* at 1222.

In contrast, the Circuit held in *Sentex Systems* that where the underlying action involved allegations that the insured had misappropriated trade secrets *and used them in its sales materials,* the insurer did have a duty to defend the action. The complaint in the underlying action alleged that the insured had misappropriated trade secret information including customer lists, methods of bidding jobs, methods and procedures for billing, marketing techniques, and other inside information. 93 F.3d at 580. The insured used the allegedly confidential information to solicit customers, and to promote and advertise its products. *Id.* In affirming the district court's finding that the potential for "advertising injury" coverage existed, the Circuit noted, "It is significant that ESSI's claims for misappropriation relate to *marketing and sales,* and *not* to secrets relating to the *manufacture and production* of security systems." *Id.* (citing *Simply Fresh,* 84 F.3d 1105, 1107–08).

■■■ Thus, whether claims relating to misappropriation of trade secrets provide the potential for coverage is a function of whether the allegations in the underlying trade secret action arose in the course of the insured's advertising activities or its production and manufacturing activities. *See Simply Fresh,* 94 F.3d at 1222. The allegations made by the plaintiff in the underlying complaint are crucial in this inquiry, as they define and circumscribe the liability faced by the insured. *See Microtec Research, Inc. v. Nationwide Mutual Ins. Co.,* 40 F.3d 968, 971 (9th Cir.1994) (although insured allegedly advertised competitor's intellectual property as its own, "[t]he complaint conspicuously and carefully omit[ted] to allege any wrongdoing with respect to [insured's] advertisements"); *see also Horace Mann,* 4 Cal.4th at 1081, 17 Cal.Rptr.2d 210, 846 P.2d 792 (determination of whether duty to defend attaches is made initially by comparing allegations of complaint with terms of policy).

■■■ The gravamen of Oakley's cause of action against Arnette for misappropriation of trade secrets is that Mr. Arnette used confidential information obtained from Oakley in designing and developing sunglasses for Arnette. The key allegation in the trade secret section of the complaint is paragraph 20, which alleges: "Specifically, Defendants Arnette utilized confidential information obtained from Plaintiff in the *design* of Defendants' 'Steel Raven' sunglasses and the *development* of the vacuum metalized frames on Defendants' 'Raven' sunglasses." (Emphasis added.)

Although Arnette advertised and marketed the products at issue, and although the complaint mentions this activity,[11] this advertising activity was incidental to the trade secrets allegedly misappropriated.

---

11. For example, Arnette points to the following sentence in the complaint: "Specifically, Defendants, within the last 90 days have been marketing and selling a sunglass known as the 'Steel Raven' which was designed as the direct result of the misappropriation of confidential information of Plaintiff." Arnette emphasizes the phrase *"marketing and selling"* in support of its argument that the complaint showed the potential for coverage.

Arnette's argument is flawed for two main reasons. First, this paragraph falls under the section of the complaint relating to Oakley's breach of contract claim and is not incorporated by reference in the allegations relating to the misappropriation claim. Arnette has conceded the policy provides no coverage for breach of contract. Second, the sentence itself indicates that the confidential information was allegedly employed in the *"design* [ ]" of the sunglasses. Thus, the "marketing and selling" activity was peripheral to the alleged misappropriation.

The Oakley complaint does not seek relief for the marketing and advertising of its alleged secrets but for their use in design, development and production. Indeed, the alleged secrets were not disclosed through advertising, rather they were allegedly used to manufacture and produce sunglasses. Accordingly, the nexus between any advertising activity related to the sunglasses and the alleged misappropriation of trade secrets is not sufficient to create a potential for coverage under the policy's advertising injury provision. *See Microtec*, 40 F.3d at 971; *Bank of the West*, 2 Cal.4th at 1275, 10 Cal.Rptr.2d 538, 833 P.2d 545.[12]

### III.

### *CONCLUSION*

Based on the foregoing, the Court finds that Hartford breached its duty to defend and indemnify Arnette in the Pouilloux action but that neither duty was breached in the Oakley action. Accordingly, the Plaintiffs' motion for summary adjudication is granted in part and denied in part. Defendant's motion regarding the Pouilloux matter is denied and its motion regarding the Oakley action is granted.

**IT IS SO ORDERED.**

12. Given the lack of potential coverage of the trade secret violations alleged by Oakley, the Court does not reach the issues of the first publication exclusion, the duty of good faith and fair dealing, or the duty to indemnify in the context of the Oakley action.